ALLEN MOORE AND MARGARET R. MOORE, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 58374, 58375, 58376, 58405. Filed September 30, 1958.

*Ewing Everett, Esq.*, and *Eugene Chester, Esq.*, for the petitioners.
*Paul J. Henry, Esq.*, and *Chester M. Howe, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax for the taxable years 1949 and 1950 as follows:

| Docket No. | Petitioners | 1949 | 1950 |
|---|---|---|---|
| 58374 | Allen Moore and Margaret R. Moore | $27.78 | $406.48 |
| 58375 | Maxwell Moore and Alice C. Moore | 30.22 | 507.20 |
| 58376 | Maurice H. Pease and Barbara M. Pease | 47.72 | 1,077.33 |
| 58405 | Roswell Moore and Elisabeth T. Moore | 78.94 | 386.72 |

The petitioners concede the deficiencies for the taxable year 1949 as determined by the respondent. The only issue remaining for decision is whether gains from the sale of building lots realized by a trust in 1950 and taxable to the petitioners in that year as beneficiaries of the trust are taxable as ordinary income as determined by the respondent, or as long-term capital gain as contended by the petitioners.

FINDINGS OF FACT.

Some of the facts are stipulated and are incorporated herein by this reference.

---

[1] The following proceedings are consolidated herewith: Maxwell Moore and Alice C. Moore, Docket No. 58375; Maurice H. Pease and Barbara M. Pease, Docket No. 58376; and Roswell Moore and Elisabeth T. Moore, Docket No. 58405.

The eight petitioners herein consist of four married couples who filed timely joint income tax returns on the cash basis for the calendar years 1949 and 1950 with the collector of internal revenue for the district of Connecticut.

E. A. Moore was the father of petitioners Allen Moore, Maxwell Moore, Roswell Moore, and Barbara M. Pease. E. A. Moore was reared in the New Britain, Connecticut, area. He rose to the position of president and chairman of the board of the Stanley Works, a large hardware-manufacturing company located in that area. He died February 15, 1956, at the age of 91.

E. A. Moore was the owner of 2 parcels of land, one known as the Upper Farm and the other known as the Lower Farm. He was brought up on the farm and was interested in raising purebred Guernsey stock. He purchased the Upper Farm, located at Berlin, Connecticut, which was near his home, sometime before 1913 to operate it as a dairy farm and to raise purebred stock. The Lower Farm was the family homestead which he later acquired by inheritance from his brother and sister. During the period he owned these properties he operated them both as farmland for the production of feed and hay crops, and for pasturing the animals.

In 1923 a firm which he employed made a survey of the Upper Farm property, laid out streets and lots, and prepared subdivision maps of the area. E. A. Moore also purchased from an aerial survey company an aerial map covering this farm, which that company had for sale to the general public. However, apparently nothing further was done at that time towards subdividing the property.

It was the desire of E. A. Moore that all his children should have lots in this area and build their homes thereon. Accordingly, in 1937 he gave 2 lots on the Upper Farm to the petitioner Allen Moore, who built his home there, and 1 lot to the petitioner Barbara M. Pease. In 1937 and 1938 he gave 2 lots to the Mooreland Hill School. In 1938 he constructed Mooreland Road through the property and sold 4 lots on that road to a friend, applying the proceeds toward the construction of the road. By that time he was at an advanced age and did not want to be burdened with looking after the property. After terminating his farming operations and selling his farming equipment and stock, he in 1938 and 1939 made gifts of the remainder of the Upper Farm to all the petitioners and Martha Moore, his daughter who is not a petitioner herein, each acquiring an equal undivided one-ninth interest.

On January 30, 1939, the Mooreland Hill Trust was created by the donees, each of whom then transferred to the trust his undivided one-ninth interest in the Upper Farm. The male petitioners herein were named trustees at the time of creation of the trust and continued

to act in that capacity through the taxable years involved herein. The trust instrument states in part:

WHEREAS all the parties of the first part deem it impractical to equitably partition said real estate among themselves and

WHEREAS the parties of the first part are all desirous of selling and liquidating said real estate as soon as practicable at a fair price, and

WHEREAS much of said land can be made desirable and salable for building lots, and

WHEREAS each of the parties of the first part believes that the selling and liquidating of said real estate can be most advantageously accomplished by placing all of the real estate in the hands of said Maurice H. Pease, said Allen Moore, said Roswell Moore and said Maxwell Moore, as trustees for all the parties hereto, and

WHEREAS the sole purpose of this trust agreement is to accomplish the sale and liquidation of said real estate and the division of the proceeds, less expenses among the beneficiaries of this trust in proportion to their interests therein,

\* \* \* \* \* \* \*

\* \* \* the parties of the second part shall have the following powers:

(a) To sell exchange and or convey any or all of the real estate hereinbefore referred to in order to carry out the purpose of this trust, and to sell, exchange and or convey any or all other property real or personal that may in the future be acquired by the trust estate, for the foregoing purpose.

\* \* \* \* \* \* \*

(c) To lease any or all real estate belonging to the trust estate for such length of time and on such terms as said parties of the second part may deem best, in order to carry out the purpose of this trust.

\* \* \* \* \* \* \*

(i) To make repairs and improvements in and on any real estate belonging to the trust estate, which the parties of the second part in their discretion may deem necessary or proper, for the purpose of this trust.

(j) To grade, lay out streets, install sewers and water mains and otherwise develope any real estate belonging to the trust estate, for the purpose of this trust.

\* \* \* \* \* \* \*

(m) To build or rebuild any dwelling house or other building or additions to buildings for the purpose of this trust (but not to carry on a building business).

\* \* \* \* \* \* \*

(p) To employ real estate agents in selling or leasing real estate belonging to the trust estate and to pay reasonable fees for their services.

\* \* \* \* \* \* \*

Third: The parties of the second part shall annually or oftener at their discretion, divide and distribute to the beneficiaries hereof in proportion to their interests herein, all liquid assets of the trust estate, not needed in their opinion to accomplish the advantageous liquidation of the unliquidated assets of this trust.

\* \* \* \* \* \* \*

Thirteenth: This trust, if not sooner terminated by the sale of all the real estate belonging to the trust estate and distribution of all the net proceeds, shall continue until revoked by a majority vote of the beneficiaries hereunder \* \* \*

The affairs of the trust were handled principally by the petitioner Allen Moore. Activities of the other trustees were limited to con-

sultations with him. The trust maintained no offices, its name was not exhibited anywhere, and it was not listed in the telephone directory. No trustee or beneficiary ever received any compensation for any activity on behalf of the trust, and no secretary was employed, although on occasion matters were handled by E. A. Moore's personal secretary at the Stanley Works. The trust had no employees. None of the petitioners was a licensed real estate broker or agent.

It was the purpose of the trustees to create a small community and restrict sales of lots to relatives, family friends, or others who would be good neighbors or friends. Accordingly, no promotional activities for the sale of lots were carried on. There was no advertising by the placing of signs or otherwise. A list of available lots would be made available upon inquiry, most of the selling activities being initiated over the telephone.

During the years 1947 through 1950 C. W. Parker, a real estate agent, obtained purchasers for 7 of the 11 lots sold by the trust in that period, upon which he received a commission of 5 per cent. No other lots were ever sold by a real estate agent. Parker was never engaged by the trust either orally or in writing to act as its agent in selling lots, but had at his disposal survey maps indicating lot subdivisions, which had been given to him at his request. He was an agent for the sale of lots in an adjoining country club area, and if he met a prospective buyer whom he considered a desirable person for one of the lots on the Upper Farm, also known as the Mooreland Hill property, he would then inquire of Allen Moore as to the lots which were available and the price thereof.

Considerations entering into selecting desirable purchasers included occupation, income, and education. In deeds to the lots the trust reserved the right to approve building plans in order that the buildings might conform to the pattern which would be desirable from a community standpoint. Each deed also reserved to the trust the right to repurchase the lot within a period of 3 to 3½ years after the sale, at the selling price. The purpose of this provision was to protect the Moores and the community from having a purchaser resell the lot to one not considered desirable in the community. During the period from 1939 through 1950 this right was exercised in two instances. These lots were resold 2 or 3 years later by the trust at a price which was $95 or $100 greater in order to cover commission expense.

At the time of the acquisition of the Upper Farm by E. A. Moore it was bounded on the east and north by two roads, with total frontage of 1,700 feet. In addition to the road he constructed in 1938, the trust had two roads constructed in 1947 at a cost of $7,327.07. The subdivision regulations of the town of Berlin, Connecticut, required that a subdivision should have streets constructed in accord-

ance with certain specifications. The two roads (or streets) constructed by the trust were graded and surfaced with gravel and sand, and oiled. Water mains were installed in accordance with local requirements, but no sanitary sewers were constructed. These two roads were deeded to the town of Berlin, as required by local law.

Aside from these improvements, no other improvements were made to the property.

Not all of the Upper Farm was laid out in lots. A survey map prepared in August 1950 shows that 32 lots had been laid out, in addition to the area set aside for the Mooreland Hill School. It also shows a remaining area of 40.94 acres. At some later time 22 additional lots were laid out in pencil on the map.

In the period since the creation of the trust in 1939 through 1950, 22 sales of lots on the Upper Farm (including the resale of 2 lots reacquired from purchasers) were effected by the trust as follows:

| Year | Number of lots sold | Lot number | Block number | Cost | Selling price |
|---|---|---|---|---|---|
| 1939 | 2 | 2 | III | $743.39 | $1,620 |
|  |  | 7 | VIII | 743.39 | 1,805 |
| 1940 | (1) |  |  |  |  |
| 1941 | 1 | 7 | VIII | 1,805.00 | 1,900 |
| 1942 | (1) |  |  |  |  |
| 1943 | (1) |  |  |  |  |
| 1944 | (1) |  |  |  |  |
| 1945 | 3 | 4 | VIII | 859.90 | 2,700 |
|  |  | 3 | VIII | 880.37 | 3,000 |
|  |  | 2 | VIII | 962.27 | 3,200 |
| 1946 | 5 | 5 | VIII | 808.43 | 2,400 |
|  |  | 1 | III | 808.43 | 1,800 |
|  |  | 6 | VIII | 787.43 | 2,200 |
|  |  | 6 | III | 944.42 | 2,500 |
|  |  | 8A | VIII | 304.47 | 500 |
| 1947 | 4 | 4 | I | 587.95 | 2,000 |
|  |  | 8B | VIII | 745.44 | 1,800 |
|  |  | 9 | VIII | 1,622.16 | 2,000 |
|  |  | 4 | III | 944.92 | 2,500 |
| 1948 | (1) |  |  |  |  |
| 1949 | 1 | 6 | VIII | 2,200.00 | 2,300 |
| 1950 | 6 | 3 | I | 608.95 | 2,000 |
|  |  | 5 | II | 913.42 | 2,000 |
|  |  | 4 | II | 892.42 | 2,000 |
|  |  | 17 | V | 1,270.40 | 4,000 |
|  |  | 10 | VIII | 1,922.56 | 2,000 |
|  |  | 10 | VII | 523.03 | 2,800 |
| Total | 22 |  |  | 21,887.75 | 49,025 |

[1] None.

In addition, the trust gave 2 additional lots to the Mooreland Hills School in 1940.

The trust continued in existence after 1950 with the continuing intention to further subdivide and sell lots in the Upper Farm. No more than 6 lots were ever sold in any 1 year. The total number of lots sold from the beginning of the trust up to the time of the hearing was approximately 40. In 1951 the trust constructed an additional street or road, and in 1955 another road was extended.

The Lower Farm had been the family homestead, and E. A. Moore desired that it remain in the family. In 1946 and 1947 he trans-

ferred a one-ninth undivided interest in the Lower Farm to each of the petitioners herein and his daughter Martha Moore by deed of gift. On February 28, 1947, each of these individuals transferred his one-ninth undivided interest in the Lower Farm to the trust. There was not at any time any intention of the trustees to subdivide the Lower Farm for sale, and it was not subdivided.

The structures on the Lower Farm included three dwellings, several barns, a garage, and a silo. The structures on the Upper Farm included two dwellings, a large cow barn, a horse barn, dairy house, sheds, a garage, and a silo. Prior to and during the years 1949 and 1950 the Lower Farm and the unsold portion of the Upper Farm were leased to tenant farmers and other lessees. One of the tenants who occupied the main house on the Upper Farm used some of the structures for his milk distribution business. Rent received from both properties amounted to $3,018 and $3,303 in 1949 and 1950, respectively. Each lease provided that any portion of the land which might be sold was to be withdrawn from the lease, with a consequent reduction of rental. Some of the sales of lots in the Upper Farm after 1950 included those containing structures which had been rented during the years 1949 and 1950.

The Mooreland Hill School was a small school, the enrollment being about 40 or 50 pupils from the sixth to the ninth grades. Petitioner Allen Moore is a trustee of the school, which is a nonprofit organization. Although the petitioners devoted time to the school none derived any income from it.

Since graduation from college in 1921 Allen Moore has been employed on a full-time basis at the Stanley Works where he was in charge of two woodworking plants. Principal occupations of all the male petitioners and the approximate joint net income of each and his spouse during the taxable years involved herein were as follows:

| Name | | Joint income | |
| --- | --- | --- | --- |
| | | 1949 | 1950 |
| Roswell Moore | Captain, United States Army | $3,300 | $5,600 |
| Maxwell Moore | Architect | 20,000 | 33,000 |
| Maurice H. Pease | Vice president, Stanley Works | 56,000 | 79,000 |
| Allen Moore | Executive, Stanley Works | 26,000 | 25,000 |

The wives of the above were occupied as housewives during these years and had no activities in connection with the trust other than to receive telephone inquiries with respect to the lots.

During the period 1939 through 1950 the trust made only two distributions to the beneficiaries.

For the calendar year 1950 Mooreland Hill Trust filed a fiduciary income tax return, Form 1041, reporting long-term capital gain of $8,656.22 from the sale of 6 lots, one-half of which is treated as tax-

able. Each of the petitioners, as beneficiary of the trust, treated his distributive or distributed share as long-term capital gain. The respondent held that the sales of lots by the trust resulted in ordinary income of $9,016.70 realized in the course of trade or business, and that the distributive share of the petitioners constituted ordinary income to them.

The lots sold by the trust in 1950 did not constitute property held primarily for sale to customers in the ordinary course of trade or business, and the distributive share of each petitioner beneficiary in the gain from the sale of such lots constituted long-term capital gain and not ordinary income.

### OPINION.

The only question now at issue is whether the distributive share of each petitioner of the gain derived by the Mooreland Hill Trust from the sale of lots constituted ordinary income, as held by the respondent, or long-term capital gain as claimed by the petitioners. The petitioners contend that the property in question constituted a capital asset under section 117 (a) of the Internal Revenue Code of 1939, held for more than 6 months, or real property used in the trade or business held for more than 6 months, within the meaning of section 117 (j), and that under section 117 (b) only one-half of the gain is to be taken into account. The pertinent sections of the 1939 Code are set forth in the margin.[2]

---

[2] SEC. 117. CAPITAL GAINS AND LOSSES.

    (a) DEFINITIONS.—As used in this chapter—

        (1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

            (A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

            (B) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), or real property used in his trade or business;

        &ast;        &ast;        &ast;        &ast;        &ast;        &ast;        &ast;

        (4) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing net income;

        &ast;        &ast;        &ast;        &ast;        &ast;        &ast;        &ast;

    (b) PERCENTAGE TAKEN INTO ACCOUNT.—In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital gain, net capital loss, and net income:

        100 per centum if the capital asset has been held for not more than 6 months;

        50 per centum if the capital asset has been held for more than 6 months.

        &ast;        &ast;        &ast;        &ast;        &ast;        &ast;        &ast;

    (j) GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

        (1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand

The answer to the problem turns upon whether the property sold was "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

This and other courts have decided numerous cases in which this question has been presented under varying circumstances. Many factors are to be taken into consideration, but no one factor is decisive, and in the final analysis each case must be decided in the light of all the facts.

It has been recognized that one may liquidate an asset in the most advantageous way and still obtain capital gains treatment, but the question is whether at the time of sale the property is held merely for liquidation, or whether the owner has entered into business and is holding the property primarily for sale to customers in the ordinary course of the business. *Frieda E. J. Farley*, 7 T. C. 198; *Martin Dressen*, 17 T. C. 1443; *Estate of Luke J. Barrios*, 29 T. C. 378; *Phipps* v. *Commissioner*, (C. A. 2) 54 F. 2d 469; and *Home Co.* v. *Commissioner*, (C. A. 10) 212 F. 2d 637. In the last cited case the court stated:

> One may, of course, liquidate a capital asset. To do so it is necessary to sell. The sale may be conducted in the most advantageous manner to the seller and he will not lose the benefits of the capital gain provision of the statute, unless he enters the real estate business and carries on the sale in the manner in which such a business is ordinarily conducted. In that event, the liquidation constitutes a business and a sale in the ordinary course of such a business and the preferred tax status is lost.

In *W. T. Thrift, Sr.*, 15 T. C. 366, we enumerated some of the important factors as follows:

> The governing considerations have been the purpose or reason for the taxpayer's acquisition of the property and in disposing of it, the continuity of sales or sales related activity over a period of time; the number, frequency, and substantiality of sales, and the extent to which the owner or his agents engaged in sales activities by developing or improving the property, soliciting customers, and advertising. *Boomhower* v. *United States*, 74 F. Supp. 997. No one of these tests can be regarded as determinative but the question must be viewed in the light of all pertinent factors and particularly the facts of the individual case.

Here the real parties in interest, the nine individuals who created the trust, had obtained their undivided equal interests in the Upper

---

at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *

(2) GENERAL RULE.—If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion * * * of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *

Farm by gift from E. A. Moore. It seems clear that since they could not themselves use the property their purpose was to liquidate the same. Such property had been used by E. A. Moore for farming and cattle raising, and although it would appear that he had a view to eventual subdivision and sale of lots, as evidenced by the fact that he had a plan of a subdivision made in 1923 and had a road constructed in 1938, we think that the petitioners, when they received the property by way of gift, did not have the intent to enter into a business of subdividing and selling real estate. Apparently the children did not take the property under any condition imposed by the donor, E. A. Moore, that they conduct such a business. Indeed, Allen Moore testified that it was his father's idea that the trust should be a liquidating trust. Rather, we think the record shows that they merely intended to dispose of the property to their best advantage. To conveniently dispose of the property they set up a trust. From a consideration of all the evidence, we think the trust instrument properly recites the reason for the creation of the trust and its purposes. That instrument recites that it was impracticable to equitably partition the real estate among the nine donees, that all the donees were desirous of selling and liquidating the property at a fair price, that the sale and liquidation could be most advantageously accomplished by the use of the trust and by selling the property as building lots, and that the sole purpose of the trust was to accomplish the sale and liquidation of the property and the division of the proceeds among the beneficiaries.

The trust did not engage in any other dealings in real estate, nor apparently did the beneficiaries, all of whom were engaged in other occupations. No improvements were made on the property other than the minimum improvements required by local ordinances for the sale of lots in a subdivision, namely, the construction of roads with water mains. The cost of such improvements to the trust up to the year 1950, the year before us, was less than $7,500, whereas the sales of lots during the existence of the trust through the year 1950 amounted to about $49,000.

There was no advertisement of lots for sale and no soliciting of customers. The purpose of the trustees was to limit the sales of lots to friends and relatives of the Moore family and others who would be desirable friends and neighbors, in order to build up a desirable residential community. The sales were infrequent, never amounting to more than six in any one year, and in some years none at all. Over the period from the creation of the trust in 1939 up to the time of the hearing in this case in 1957, the sales had not exceeded approximately 40 lots. No regular sales agent was employed. The trust had no office or employees, and its name did not appear before the public in telephone directories or otherwise.

Upon the basis of the whole record, we conclude that the development and sales activities of the trust were not so extensive as to constitute the carrying on of a trade or business. The disposition of the gift property was by means of a gradual and passive liquidation and not through the conduct of a trade or business. See *Frieda E. J. Farley, supra, Martin Dressen, supra*. It follows that the lots were not held primarily for sale to customers in the ordinary course of a trade or business. We think the gain realized as a result of the sales was not attributable, to any substantial degree, to anything other than the enhancement in value of the property over the many years it had been held by the Moore family and their trust. Hence, we think that on the facts of this case, as was held in the *Farley* case, *supra*, in reliance upon *Burnet* v. *Harmel*, 287 U. S. 103, the gain is of the character which Congress intended should receive the favorable tax treatment provided by the capital gains provisions.

Since the property in question was held for more than 6 months the gain from the sale thereof is to be treated as long-term capital gain in the hands of the trust and would have the same character in the hands of the petitioners who were beneficiaries thereof.

We hold that the respondent erred in treating the distributive share of each petitioner of the gain from the sale of the lots as ordinary income. It is not clear whether the parties are in agreement as to the precise amount of capital gain derived by the trust in 1950 from the sale of lots. This matter will be settled in connection with the recomputations under Rule 50.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

TIETJENS, *J.*, dissents.