*Decisions will be entered under Rule 50.*

ESTATE OF WILLIAM D. MUNDY, DECEASED, JOAN B. MUNDY, EXECUTRIX, AND JOAN B. MUNDY, INDIVIDUALLY, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 81315–81317. Filed July 21, 1961.

*George F. Townes, Esq.*, for the petitioners.
*James E. Johnson, Jr., Esq.*, for the respondent.

DRENNEN, *Judge:* In these consolidated proceedings, respondent determined deficiencies in income tax for the calendar years and in the amounts as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 81315 | Estate of William D. Mundy, deceased, Joan B. Mundy, executrix, and Joan B. Mundy, individually | 1954 | $1,130.85 |
| | | 1955 | 817.50 |
| | | 1956 | 228.69 |
| 81316 | James C. Mundy III and Emily B. Mundy | 1954 | 1,407.23 |
| | | 1955 | 918.01 |
| | | 1956 | 575.64 |
| 81317 | S. W. Creech and Ruth M. Creech | 1954 | 3,673.76 |
| | | 1955 | 1,384.26 |
| | | 1956 | 1,964.52 |

[1] Proceedings of the following petitioners are consolidated herewith: James C. Mundy III and Emily B. Mundy, Docket No. 81316, and S. W. Creech and Ruth M. Creech, Docket No. 81317.

The principal issue in all three cases is whether the gain realized from the sale of lots in 1954, 1955, and 1956 by the partnership known as Mundy Property, in which William D. Mundy, James C. Mundy III, and Ruth M. Creech were partners, is to be considered as gain from the sale of capital assets or as ordinary income in those years; and in Docket No. 81317, two other issues are: (1) Whether the gain realized by Ruth M. Creech from the sale by her of a lot in 1954 is to be considered as gain from the sale of a capital asset or as ordinary income in that year, and (2) the fair market value of certain lots sold to S. W. Creech in 1954 and 1956 by a corporation of which he was a stockholder. It is agreed that the excess of the fair market value over the amount Creech paid for the lots was a dividend to Creech.

Other issues raised by the pleadings relating to medical expense deductions and to deficiencies in self-employment tax will automatically be resolved upon the basis of the foregoing issues. Petitioners in Docket Nos. 81315 and 81317 have abandoned issues relating to charitable contributions.

FINDINGS OF FACT.

Some of the facts have been stipulated and are found as stipulated.

Petitioner Joan B. Mundy, executrix of the estate of William D. Mundy, deceased, was the wife of William D. Mundy, hereinafter referred to as William, during the taxable years 1954, 1955, and 1956. They filed joint income tax returns for those years with the director of internal revenue for the district of South Carolina. Their returns showed their residence as Greenville, South Carolina, in each of those years. An amended return was filed for the year 1954 on April 14, 1958. Schedules C, Profit (or Loss) From Business or Profession, reporting net profit from William's business in the amount of $1,287.70 and listing his principal business activity as "Outside Salesman— Methods & Systems & Real Estate," were filed by William and Joan with both their original and amended returns for the year 1954. William died May 15, 1959.

Petitioners James C. Mundy III and Emily B. Mundy, hereinafter referred to as James and Emily, respectively, were husband and wife during the taxable years 1954, 1955, and 1956. James and Emily filed joint income tax returns for the taxable years 1954, 1955, and 1956 with the director of internal revenue for the district of South Carolina, their returns stating their home address to be Greenville, South Carolina. However, during those years, James was on active duty with the United States Military Forces and Emily was employed by the United States Air Force. An amended return was filed for the year 1954 on April 14, 1958.

S. W. Creech and Ruth M. Creech, hereinafter referred to as Sam and Ruth, respectively, were husband and wife and were residents of

Greenville, South Carolina, during the taxable years 1954, 1955, and 1956. They filed joint income tax returns for those years with the director of internal revenue for the district of South Carolina. An amended return was filed for the year 1954 on April 14, 1958.

William, James, and Ruth, hereinafter referred to collectively as the Mundy heirs, were the only children of James C. Mundy, Jr., who died testate on June 26, 1948. Upon the death of their father, they inherited a 52.6-acre tract of land, hereinafter referred to as the Mundy tract, on Edwards Road near Greenville, South Carolina. In 1948 this tract was country land. Two houses were situated on the tract and at the time of the death of James C. Mundy, Jr., James was living in one of the houses and the other house was being rented to third parties. Both houses were occupied on different occasions after the death of their father by each of the Mundy heirs.

The Mundy heirs wanted and attempted to sell or liquidate the Mundy tract "at its value" from the time they inherited it but they received no offers for the tract as a whole. Two lots on which were located the two houses were sold by the heirs in 1950 and 1952, and on January 16, 1953, an unimproved lot was sold with the deed containing the following recital: "That the remaining portion of said tract of land * * * shall be used for residential purposes only and any deeds by us to a purchaser of any lot out of said tract shall contain such a restriction therein."

In August 1950, James was recalled to active duty in the military service and, except for occasional visits, was away from Greenville from that year until his return in 1957. In 1953, James was stationed in Korea and Japan, and his wife, Emily, lived in Bamburg, South Carolina, during that year until she joined him in Japan.

During the period 1950 through 1953, William spent considerable time in Florence, South Carolina. When James, who was the executor of the estate of James C. Mundy, Jr., left Greenville in 1950, the management of the Mundy tract was left to Ruth's husband, Sam. James felt that Sam would look after Ruth's best interests with respect to the property and, in so doing, would look after the interests of James and William. The Mundy heirs never discussed with Sam the subdivision of the tract or placing it in the hands of a real estate agent but simply asked him to dispose of the property at its true value as soon as possible. Sam felt that his authority to act for the Mundy heirs did not go beyond putting the tract in the hands of a realtor. Sam approached two realty firms and discussed with them the possibility of improving and developing the tract in order to sell it. The Mundy heirs had no money with which to develop the property, and the two realty firms were not interested in developing the tract.

In 1953, Sam approached a third real estate company, Central Realty Corporation, hereinafter referred to as Central Realty, which was in the business of land development, and was successful in interesting this company in the development and sale of the Mundy tract. Before 1953, Sam had asked Central Realty to consider developing the tract, but Central had not considered that tract ready for development. However, in 1953, Lake Forest, Inc., a corporation owning land adjacent to the Mundy tract, was preparing to develop its land, and the city of Greenville was growing in the direction of the Mundy tract. Therefore, Central Realty was willing to develop and sell the Mundy tract in 1953.

On June 3, 1953, the Mundy heirs entered into an agreement with Central Realty and a related corporation, Central Agencies Company, which provided in part, that whereas the Mundy heirs owned a tract of land and were desirous of having Central Agencies Company, referred to therein as "agent," supervise the development of said tract as a subdivision and serve as sales agent for said subdivision, and were likewise desirous of having Central Realty advance the necessary funds in order to develop said subdivision, therefore, in consideration of the mutual benefits to be derived therefrom, the parties agreed (1) that Central Agencies Company would supervise the development of said tract and would act as exclusive selling agent for a commission of 15 percent of the sales price of each lot; (2) that Central Realty would advance the owners the necessary funds for the development of said subdivision, evidenced by a note bearing interest at 5¾ percent and secured by a mortgage on the property, which note would be paid by applying one-third of the sales price of each lot thereon; and (3) that Central Realty might undertake the collection of any deferred payments in connection with the sale of said lots for a commission of 5 percent on all amounts so collected, retaining from said collections such amounts as necessary to apply on the note one-third of the sales price of each lot. The agreement was to remain in full force for a period of 5 years and if two-thirds of the lots had been sold by that time, the agreement would be automatically extended 2 years. The agreement also provided that the lots were to be sold at a price to be mutually agreed upon by the owners and agent, that the agent was authorized to execute any and all contracts in connection with consummating the sale of the lots, that the owners reserved the right to select any four lots for their own use, and that should the owners desire to construct a dam or lake in the subdivision, the owners assumed full liability in connection therewith.

This contract was prepared by Central Realty, and none of the Mundy heirs made any comments or suggestions concerning the agreement. William and Ruth simply signed it; James did not personally

sign the contract (Emily signed it as his attorney in fact) and was unaware of its existence until these cases arose. The terms of the contract were laid down by Central Realty which was to have full control in developing and selling the tract, a condition agreed to before Central Realty would consent to handle the property. The only suggestion made by Sam was with respect to the four lots which were to be reserved from the terms of the contract and to be held one each by William, James, Ruth, and their mother.

The tract was subdivided and improvements were made to the lots, consisting of installation of waterlines, fire hydrants, and hard-surface roads, and construction of a lake known as Lake Fairfield in conjunction with Lake Forest, Inc. The cost of all these improvements on the Mundy tract was $14,530.28.

Central Realty made the decision to pave streets, bring in water service, and make other improvements. Neither the Mundy heirs nor Sam had anything to do with this decision or with the actual development and sale of the property. In the opinion of Central Realty, development of the Mundy tract was necessary to realize its full value, and making improvements was the only way to sell the lots in the tract for a reasonable price. Central Realty contracted for the development and improvement work to be done and selected the persons to do it. Also, Central Realty prepared restrictions for lots and chose the attorneys who prepared deeds for lots. Central Realty did not advertise the lots but, as was usual when it set up a subdivision, it did arrange to pay a commission to other realtors in Greenville for selling lots.

Lake Forest, Inc., was formed to subdivide land and sell lots. It was incorporated under the laws of the State of South Carolina on March 17, 1953, and commenced business on April 15, 1953.

Sam became one of the original stockholders of Lake Forest, Inc., and has, at all times, owned a one-third stock interest in that corporation. The remaining two-thirds stock interest is owned by L. E. Dellinger, John S. Taylor, Jr., and John S. Taylor, Sr. Sam became president of Lake Forest, Inc.

Plats of the Mundy tract and the adjoining land owned by Lake Forest, Inc., show only one subdivision, that is, Lake Forest. The Mundy tract and the Lake Forest, Inc., property are platted together. The idea of making a lake partially on the Lake Forest property and partially on the Mundy tract was that of John S. Taylor, Jr.

The 69 lots forming the Mundy-tract section of Lake Forest subdivision were known as the Mundy property. This property was operated as a partnership within the purview of the Internal Revenue Code, the partnership being known as "Mundy Property." There

was no written agreement among the Mundy heirs with respect to the Mundy tract. [2]

Central Realty maintained records pertaining to sales, collections, accounts receivable, etc., applicable to the business. All collections were made by Central Realty. A periodic analysis of cash receipts and disbursements was submitted to the partnership by Central Realty. James' share of the proceeds of sales was deposited to his account in a bank in Greenville by Central Agencies Company.

Mundy Property filed partnership returns for the years 1954, 1955, and 1956 with the director of internal revenue for the district of South Carolina. An amended partnership return was filed for 1954 on April 14, 1958. Each partnership return was signed by Sam as the agent for the partnership. Attached to the original 1954 partnership return was a statement explaining that the partnership had been advised that capital gains treatment was to be accorded gain from the sales of the lots located in Lake Forest subdivision, and taxable installment collections received in 1954 from the 1953 sales were treated as capital gains as well as profits from all 1954 sales of lots. The amended partnership return contained a statement explaining that gains on the original 1954 return were erroneously computed under section 1237 of the 1954 Code. The statement also explained that the profits from the sales of lots were treated as capital gains "under the rule stated in such cases as Arthur W. Smith, et al vs. Dunn 224 F. (2nd) 353." Gain on the sale of lots in 1953 was reported as ordinary income by the partnership on its return for 1953.

The following sales of lots were made by the Mundy Property partnership during the years indicated:

| Year | Outright sales | Install- ment sales | Total |
|---|---|---|---|
| 1953 | 8 | 13 | 21 |
| 1954 | 16 | 15 | 31 |
| 1955 | 3 | 10 | 13 |
| 1956 | 0 | 0 | 0 |
| Total | 27 | 38 | 65 |

The following distributions of profits from sales of lots were made by the Mundy Property partnership to its partners during the years indicated:

| Partner | 1954 | 1955 | 1956 |
|---|---|---|---|
| Ruth M. Creech | $11,024.06 | $7,686.06 | $3,277.80 |
| James C. Mundy III | 11,024.06 | 7,686.06 | 3,277.80 |
| William D. Mundy | 11,024.06 | 7,686.06 | 3,277.80 |

[2] There is no explanation in the record of how or when the partnership designated "Mundy Property" was formed or of its purpose. We assume it was an informal partnership formed by oral agreement or tacit consent of the Mundy heirs for convenience in accounting for the property.

Lake Forest, Inc., acquired undeveloped land adjacent to the Mundy tract in 1953 and subdivided it into approximately 129 lots. The total cost of these lots to the corporation, including improvements, made the average cost of each lot $615.29 in the hands of Lake Forest, Inc.

Since its organization, Lake Forest, Inc., from time to time, has sold lots to each of the stockholders.

In 1954 and 1956, Sam bought six lots from Lake Forest, Inc. The price which Sam paid for each lot and the fair market value of each lot at the time Sam made the purchase were as follows:

| 1954 | | |
| --- | --- | --- |
| Lot | Selling price | Fair market value |
| 41 Tranquil Avenue | $615.29 | $2,500 |
| 104 Berryhill Road | 250.00 | 2,000 |
| 156 Rockmont Road | 250.00 | 2,500 |
| 1956 | | |
| 168 Malvern Place | 1,500.00 | 2,250 |
| 123 Hermitage Road | 1,500.00 | 750 |
| 114 Hermitage Road | | 2,000 |

### ULTIMATE FINDING.

The lots held by petitioners or the partnership Mundy Property in Lake Forest subdivision were not held in 1954, 1955, and 1956 primarily for sale to customers in the ordinary course of their or its trade or business.

### OPINION.

The principal issue is whether the Mundy heirs may treat their distributive shares of the profits from the sales of lots by their partnership, Mundy Property, as capital gain or as ordinary income. The parties agree that section 1221 of the Internal Revenue Code of 1954 [3] governs the issue and that section 1237 has no application.[4] Therefore, the basic question is whether the Mundy heirs, or their partnership, held the lots in Lake Forest subdivision primarily for sale to customers in the ordinary course of their trade or business. If they did so hold the lots, then section 1221(1) would exclude the lots from the classification of capital assets, and the Mundy heirs would be obliged to treat their distributive shares of such gain as ordinary income, as determined by respondent, rather than as capital gain as reported on their returns for the years here involved.

---

[3] All Code references are to the Internal Revenue Code of 1954 unless otherwise indicated.

[4] In view of this agreement and the fact that the case was neither presented nor argued under section 1237, we do not consider the applicability of section 1237.

The courts have been faced with this issue in many cases. But each case must be decided on its own facts and it would be of no benefit to review the decided cases here. Certain guides have evolved from the decided cases, such as the circumstances under which the taxpayer acquired the property and the length of time he holds it, his purpose in acquiring it and disposing of it, the activities of the taxpayer, or those acting either with him or on his behalf, with respect to the improvement and actual disposition of the property, the frequency and continuity of sales, etc. However, these guides or factors may be entitled to different weight in different cases, and there is no definitive pointer which can be used to arrive at the correct result in all cases.

Here the property was inherited by petitioners who had never been in the real estate business and was a capital asset in their hands at that time, and we are convinced from the evidence that their primary objective from that time on was to liquidate the property at a fair and reasonable price. None of them had any experience in the real estate business or any desire to get into it, and they did not have either the funds or the know-how to enter that business with this property themselves. They apparently had no use for the property themselves and decided almost as soon as they acquired it in 1948 to dispose of it. Whatever efforts were made to sell the property before it was subdivided in 1953 produced only three isolated sales in 1950, 1952, and early 1953. Their problem was how best to dispose of the rest of the property at a fair price. We think these factors are entitled to considerable weight in deciding this case and when considered along with all other facts here present indicate that petitioners were simply liquidating their inherited property by permitting Central Realty to subdivide it and sell it off by lots and were not holding the property primarily for sale to customers in the ordinary course of any trade or business in which they were engaged.

We realize that it has been held that a taxpayer is no less in the real estate business simply because his objective is to liquidate property than he would be if his objective were something else, if his activities with respect to the property amount to the conduct of the real estate business, *Frieda E. J. Farley*, 7 T.C. 198 (1946) ; *Achong* v. *Commissioner*, 246 F. 2d 445 (C.A. 9, 1957), affirming a Memorandum Opinion of this Court; and that the crucial question in these cases is not so much the purpose for which the property was acquired as the purpose for which the property is held at the time of sale, *Bauschard* v. *Commissioner*, 279 F. 2d 115 (C.A. 6, 1960), affirming 31 T.C. 910 (1959) ; *Friend* v. *Commissioner*, 198 F. 2d 285 (C.A. 10, 1952), affirming a Memorandum Opinion of this Court; *Mauldin* v. *Commissioner*, 195 F. 2d 714 (C.A. 10, 1952), affirming 16 T.C. 698

(1951). Nevertheless, the courts have also recognized that a taxpayer does not necessarily place himself in the real estate business by subdividing property he has inherited or held as an investment and selling it by lots in order to obtain a better price than it would attract if sold as one unimproved tract. *Smith* v. *Dunn*, 224 F. 2d 353 (C.A. 5, 1955); *Camp* v. *Murray*, 226 F. 2d 931 (C.A. 4, 1955); *Wellesley A. Ayling*, 32 T.C. 704 (1959); *Allen Moore*, 30 T.C. 1306 (1958); *W. T. Thrift, Sr.*, 15 T.C. 366 (1950). Section 1221 excludes from the definition of capital assets property held by the taxpayer *primarily* for sale to customers in the ordinary course of *his* trade or business. This requires that for property to be other than a capital asset in the hands of a taxpayer who is not otherwise in the real estate business the activities in connection with the property must be such as to place that taxpayer in the business of selling real estate.

Here it is clear that petitioners were at no time personally engaged in the real estate business and had no intention of becoming so engaged. James was away from Greenville from 1950 to 1957. William was apparently away much of the time from 1950 to 1953 and the evidence indicates that neither he nor Ruth took any active part at all in the development and sale of this property. But respondent contends that the activities of Sam and of Central Realty are to be attributed to the Mundy partnership or heirs, who carried on their business through these agents.

When James and William left Greenville, Sam, as Ruth's husband, assumed management of the tract. Sam was familiar with the heirs' desire to dispose of the property at a reasonable price as soon as possible, but he felt that his authority from the Mundy heirs did not extend beyond putting the property in the hands of a realty company, which he did. It is true that Central Realty agreed to handle the tract only after Lake Forest, Inc., began to develop adjacent land, and it is true that Sam invested in Lake Forest, Inc., in 1953. But there appears to have been no connection between Lake Forest, Inc., and Central Realty, except that Central Realty developed and improved the Mundy tract as a part of the Lake Forest subdivision. Central Realty had nothing to do with the sales of lots by Lake Forest, Inc., and Lake Forest had nothing to do with sales of the Mundy tract. So, under the particular facts of this case, Sam's activities as president of Lake Forest, Inc., cannot be attributed to the Mundy heirs. Cf. *Raymond Bauschard*, 31 T.C. 910 (1959), affd. 279 F. 2d 115 (C.A. 6, 1960).

The evidence clearly points to the conclusion that neither of the Mundy heirs nor Sam had anything to do with the development of the Mundy tract or the sales of lots after the contract with Central Realty was signed in June 1953, except that Sam approved a price list for lots and the Mundy heirs signed deeds, when they were pre-

pared by attorneys chosen by Central Realty, which actually developed and subdivided the tract.

It is well recognized that a taxpayer need not personally conduct a business of subdividing land and selling lots; he may act through agents, in which case the activities of the agents for his benefit are imputed to him. *Achong* v. *Commissioner, supra; Fackler* v. *Commissioner*, 133 F. 2d 509 (C.A. 6, 1943), affirming 45 B.T.A. 708 (1941). A taxpayer cannot insulate himself from the acts of those persons whose efforts are combined with his in a mutual endeavor to make a profit, no matter how the endeavor is denominated. *Raymond Bauschard, supra*. But this does not mean that because the agent is in the real estate business, and would be considered as holding the property primarily for sale to customers in the ordinary course of its business, that the agent's *business* can be imputed to the taxpayer. The question is whether the activities of the taxpayer, including the activities of an agent that can properly be imputed to him, taken together with all other relevant factors pertaining to the taxpayer's relationship to the property, place the taxpayer in the real estate business so that the property in question can be said to be held by taxpayer for sale to customers in *his* business.

Here the petitioners were seeking only to dispose of what was admittedly a capital asset when it was acquired and turned it over to their agent, Sam, for that purpose. Sam turned the property over to Central Realty for sale, and thereafter both Sam and petitioners were completely divorced from all control and supervision over the development and sale of the property and severed all connection with the property except to receive the net proceeds of sales. While the agreement with Central Realty called for Central Agencies to advance money to petitioners for development of the property and petitioners presumably signed a note for such advances, the agreement also provided that Central Realty should collect all proceeds of sales and apply them first to its commissions and repayment of moneys used for development purposes, and the evidence indicates that Central Realty made all decisions on what should be spent, paid the funds directly to those making the improvements, and in fact, was looking only to the proceeds of sales for return of its advances. In effect, except for bare ownership, the Mundy tract was Central Realty's subdivision after the Mundy heirs signed the agreement on June 3, 1953. Thereafter Central Realty executed sales contracts and collected the proceeds of sales. In substance, the Mundy heirs parted with the Mundy tract in one transaction when they entered into the agreement with Central Realty. Cf. *W. T. Thrift, Sr., supra*. Under the circumstances here present, we do not think the activities of Central Realty that can properly be attributed to petitioners put them in the real estate business with respect to the Mundy tract.

This case is distinguishable from *Raymond Bauschard, supra,* in which we held that the activities of a corporation organized to develop and sell real estate was attributable, through a trust, to the beneficial owners of the property. In that case, Bauschard, acting in concert with a close friend of his who was a real estate developer, purchased the property in the name of a trust for the dual purpose of protecting the community and of making a profit on his investment, the trust and a real estate corporation were set up in a deliberate effort to isolate the owners from the real estate business, but despite this fact, Bauschard controlled the selling prices of the lots, there was a relatively short lapse of time between the various acts of acquisition, development, and ultimate sale of the tract, and Bauschard was present and obviously in close touch with the development and sale of the property at all times. None of those factors is present in this case, where petitioners simply turned their inherited property over to someone else to dispose of in the manner it thought best. *George W. Longfellow,* 31 T.C. 11 (1958), is also distinguishable on its facts.

This case is more like *Allen Moore, supra,* wherein members of a family who inherited a tract of land they did not want to use conveyed it to a trust to liquidate the property by subdividing and selling it in lots; and like *Smith* v. *Dunn, supra,* wherein taxpayer, who was an architect, set about to liquidate a tract of land which he had inherited by employing an engineer to survey and plat the tract and then turned the property over to a real estate broker to improve the lots and sell them according to his own plans. In the latter case, the Court of Appeals for the Fifth Circuit held as a matter of law that the taxpayer did not hold the 51 lots sold primarily for sale to customers in the ordinary course of his trade or business; and in both cases the courts held that the owners who inherited land and simply sought to liquidate it at a fair price were not in the real estate business.

The record is not clear as to why Mundy Property, the partnership, enters into the picture. It is clear, however, that the Mundy heirs had no agreement among themselves with respect to the Mundy tract except that it was to be disposed of at its "true value" as soon as possible. The amount spent for improvements was relatively small compared to the total received from the sale of the lots, which indicates the gain realized was attributable principally to the increment in value of the land. Furthermore, the Mundy heirs did not use their own money to make the improvements—these funds were advanced by Central Realty.

Considering the entire record, we conclude that neither the Mundy heirs nor Mundy Property held the lots in question during the years 1953, 1954, and 1955 primarily for sale to customers in the ordinary course of their or its trade or business. Cf. *Smith* v. *Dunn, supra;*

*Camp* v. *Murray, supra; Dunlap* v. *Oldham Lumber Co.*, 178 F. 2d 781 (C.A. 5, 1950) ; *Allen Moore, supra; W. T. Thrift, Sr., supra; Boomhower* v. *United States*, 74 F. Supp. 997 (N.D. Iowa 1947) ; and *Gordon* v. *United States*, 159 F. Supp. 360 (Ct. Cl. 1958). We find for petitioners on this issue.

The next issue relates to the treatment to be accorded the gain from the sale of a lot by Ruth in 1954. As we understand it, the parties agree that this issue should be decided by our decision on the first issue. Consequently, we conclude that the lot sold by Ruth in 1954 was a capital asset and the gain realized thereon is taxable as capital gain.

The final issue relates to the fair market value of six lots which Sam bought from Lake Forest, Inc., in 1954 and 1956. Sam was a stockholder of Lake Forest, Inc., when he purchased three lots in 1954 and three lots in 1956, and petitioners concede that if the fair market value of a particular lot exceeded the price which Sam paid his corporation for the lot, such excess represented income to Sam in the form of dividends. We have found that, in each of the six instances, the fair market value exceeded the price which Sam paid Lake Forest, Inc., and our findings of fair market value are dispositive of this issue.

The evidence with respect to the value of these lots consisted of the testimony of Sam and two real estate men from Greenville who were familiar with real estate values in the area and who appraised these lots for petitioners, and the testimony of the revenue agent who testified solely on how he arrived at the values used in respondent's determination. While the testimony of petitioners' experts was not too clear as to how they arrived at their values, for the most part the values assigned by them were uncontradicted by any competent evidence and we think their testimony was sufficient to overcome the presumption favoring respondent's determination. As a matter of fact, the values assigned by petitioners' expert witnesses to the six lots involved did not vary too much from the values determined by respondent except in one instance, and where there was no other competent evidence of values presented we have adopted the values assigned by petitioners' two appraisers as the fair market values on the dates the lots were sold to Sam. Where other evidence of value was available we considered all of it in arriving at the values found in our Findings of Fact. The price for which Sam bought the lots from Lake Forest, Inc., was the corporation's basis in the lots and was admittedly not indicative of market value at the time Sam acquired the lots.

Lot 41 Tranquil Avenue was bought by Sam in early 1954 for $615.29 and was sold shortly thereafter for $2,500. The appraisers

used a value of $2,245, but there is no indication the lot increased in value from the date Sam acquired it until he sold it so we have adopted the selling price of $2,500 as the fair market value when Sam bought the lot, which was also used by respondent.

The revenue agent valued lot 104 Berryhill Road at $2,045 by comparing it with a similar lot sold a year later and adjusting for the increase in value during the interval. Petitioners' witnesses appraised it at $2,000 and we have adopted their figure.

Sam built his own home on lot 156 Rockmont Road which faced on the lake but with a steep grade down to the lake. He testified that he had spent about $1,500 for fill and grading on this lot in order to build a house on it. In 1954 the corporation was asking $3,500 to $4,000 for these lakefront lots, more than for the other lots, but no lots similar to this one had been sold to the time of trial. Petitioners' witnesses valued the lot at $1,750 because of the terrain and need for improvement to use it, and respondent used the asking price of $4,000. While we think the corporation was overoptimistic in fixing the asking price for these lakefront lots, we also think these lots, which the seller considered most valuable and which Sam chose as the site for his own home, must have been as valuable as other lots in the subdivision. Using our best judgment from the evidence available we arrived at a value of $2,500 for this lot.

Petitioners' witnesses valued lot 168 Malvern Place at $2,250 while respondent determined a value of $2,545 for this lot. There was no competent evidence of the value of this lot except the opinions of petitioners' experts and we have accepted their value.

Lots 123 and 114 Hermitage Road were separated by a stream but backed up to each other. Lot 123 was quite low and often had water on it. It could be used for building purposes only in conjunction with lot 114. Lot 114 was a sloping lot but did have a building site on it. Petitioners' witnesses valued lot 123 at $750 and lot 114 at $2,000, for a total value for the two lots of $2,750. The notice of deficiency determined a value of $3,000 for each of these lots but it appears that one of these $3,000 figures was intended to apply to another lot not here in controversy. The record is silent as to how the revenue agent arrived at his value for these two lots. We have adopted the values found by petitioners' witnesses.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

MURDOCK, J.,[1] dissents.

---

[1] This report was adopted, and Judge Murdock's dissent noted during his incumbency.