T.C. Memo. 1999-290


UNITED STATES TAX COURT


HARRY OLSTEIN, OLSTEIN FAMILY PARTNERSHIP,
H-EAB-O, WHITEHOUSE PARTNERS,
HARRY OLSTEIN, TAX MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 10681-98.                    Filed August 30, 1999.


<u>Neil L. Prupis</u> and <u>Eric W. Olson</u>, for petitioner.

<u>William S. Garofalo</u> and <u>Patrick E. Whelan</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

FOLEY, <u>Judge</u>:  On May 29, 1998, respondent issued Whitehouse Partners (Whitehouse) two notices of final partnership administrative adjustment that reflected adjustments to Whitehouse's partnership returns for the taxable years that ended December 31, 1993 and 1994.  On June 12, 1998, Harry Olstein,

Whitehouse's tax matters partner, petitioned the Court to redetermine respondent's adjustments to partnership items. Whitehouse's principal place of business was Morristown, New Jersey, at the time the petition was filed.

After concessions, the remaining issue for decision is whether proceeds relating to the sale of 28 developed lots are ordinary income or capital gain.

### FINDINGS OF FACT

Petitioner has been a real estate developer for over 30 years and has operated his business through several entities, including OLS Corp. (OLS), Hamptons Joint Venture (HJV), and Whitehouse. In 1983, OLS, as a nominee for HJV, acquired 97 acres (Marlboro tract) in Marlboro Township, New Jersey. HJV subdivided the Marlboro tract into 133 lots. In 1986, HJV constructed single-family homes on 77 of these lots and sold them to individual home buyers.

Beginning in 1986, homeowners, dissatisfied with the workmanship of the homes, filed lawsuits against HJV and petitioner, and litigation ensued between HJV and Marlboro Township (i.e., relating to subdivision approval granted to HJV). As a result, HJV's and petitioner's reputations as home builders were tarnished, HJV could not get the requisite municipal approval for further development, and HJV closed its model homes

and ceased development of the remaining 56 lots (i.e., 133 lots minus 77 lots that were developed and sold).

In 1987, petitioner asked several developers whether they were interested in purchasing the 56 lots. On February 10, 1988, more than a year after it ceased developing the Marlboro tract, HJV sold the 56 lots to Eli and Sol Kramer, real estate developers and principals of the Kramer Group. The Kramers operated their real estate development business through several entities. The contract between HJV and the Kramers delineated that the 56 lots would be sold in three transactions. On May 5, 1988, 17 lots were sold for $2,650,000. On May 15, 1989, 20 lots were sold for $3,230,000, payable partially in cash with the balance secured by a note and a mortgage on a portion of the 20 lots. The sale of the remaining 19 lots was scheduled to occur on May 6, 1991.

Sometime after the 1989 sale, the Kramers began experiencing financial difficulties and asked petitioner to renegotiate their contract with HJV, but petitioner refused. On February 15, 1991, the Kramers defaulted on the note and mortgage relating to the 1989 sale. On March 8, 1991, the Kramers filed a complaint against HJV in the Chancery Division of the Superior Court of New Jersey, claiming misrepresentation relating to the contract and seeking rescission of the 1991 sale. HJV filed a counterclaim for damages relating to the Kramers' breach of contract. Under

the Superior Court's October 27, 1992, final judgment, HJV received the amount due under the terms of the note and mortgage relating to the 1989 sale, and it received interest and nominal damages relating to the incomplete 1991 sale. Both parties filed notices of appeal. In its appeal, HJV requested additional damages relating to the incomplete 1991 sale because, due to the current depressed real estate market, the 19 lots would sell for an amount much lower than provided in the original contract.

On December 30, 1992, the parties entered into a settlement agreement relating to the remaining lots. Pursuant to the settlement agreement, the Kramers conveyed 9 undeveloped lots from the 1989 sale, and HJV conveyed 19 lots from the sale scheduled to occur in 1991, to Whitehouse, a partnership created in 1984 and composed of petitioner, the Olstein Family Partnership and H-EAB-O (i.e., an S corporation owned by petitioner). Petitioner believed that the settlement agreement was the only feasible way to dispose of the lots (i.e., because of the pending appeal of the Superior Court's decision Whitehouse could not convey clear title and, even if Whitehouse had clear title, the real estate market for undeveloped lots was depressed) and resolve the dispute with the Kramers (i.e., due to the Kramers' financial difficulties, it was unlikely that they could pay any judgment in full). In addition, petitioner wanted to avoid paying additional legal expenses relating to the appeal.

Whitehouse held title to the 28 lots, provided financing to the Kramers, and received 96 percent of the net proceeds from the sale of the lots, while the Kramers performed all activities necessary to develop, market, and sell the lots and received 4 percent of the net proceeds. During 1993 and 1994, the developed lots were sold to home buyers.

OPINION

Respondent contends that Whitehouse's share of the 1993 and 1994 proceeds relating to the sale of the 28 lots was ordinary income. Petitioner contends that the proceeds were capital gain. Under section 1221(1), the term "capital asset" does not include property held by a taxpayer primarily for sale to customers in the ordinary course of the taxpayer's trade or business.[1] There is no fixed formula or rule of thumb for making this determination, and each case must rest upon its own facts. See Kaltreider v. Commissioner, 255 F.2d 833, 838 (3d Cir. 1958), affg. 28 T.C. 121 (1957); see also Mauldin v. Commissioner, 195 F.2d 714, 716 (10th Cir. 1952), affg. 16 T.C. 698 (1951).

Although HJV originally acquired the Marlboro tract to build single-family homes to be sold in the ordinary course of its real estate development business, Whitehouse, as HJV's successor, did

---

[1] All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

not hold the 28 lots for that purpose. The lawsuits filed by the homeowners and Marlboro Township forced HJV to abandon its plans to sell underlined developed lots to individual home buyers. See, e.g., Eline Realty Co. v. Commissioner, 35 T.C. 1 (1960) (holding that, because a taxpayer's intent is subject to change, the determining factor relating to a taxpayer's intent is the purpose for which the property is held at the time of sale). HJV's primary objective from this point on was to dispose of the 56 undeveloped lots, and the contract with the Kramers was intended to allow HJV to achieve its objective. The Kramers, however, breached the 1988 contract, and the subsequent litigation resulted in the settlement agreement.

The settlement agreement allowed the Kramers to continue to develop and sell the 28 lots and allowed Whitehouse to complete the contract entered into by HJV. In addition, Whitehouse would not have to incur additional legal expenses. Whitehouse held the lots to facilitate the completion of the sale to, and resolve the dispute with, the Kramers. The lots were not held by Whitehouse primarily for sale to customers in the ordinary course of its business. Accordingly, the proceeds relating to the sale of the 28 developed lots are capital gain.

Respondent contends that the Kramers' activities are imputed to Whitehouse, and, as a result, Whitehouse held the lots for sale to customers in the ordinary course of business. We

conclude that the relationship between the Kramers and Whitehouse is irrelevant because Whitehouse was seeking only to dispose of a capital asset when it sold the lots.  See, e.g., Estate of Mundy v. Commissioner, 36 T.C. 703 (1961) (holding that the activities of a taxpayer, including the activities of an agent imputed to the taxpayer, taken together with all other facts, must place the taxpayer in a business so that the property in question can be said to be held by the taxpayer for sale to customers in his business); cf. Kaltreider v. Commissioner, supra (noting that the taxpayers sold property to their closely held corporation to develop and sell); Bauschard v. Commissioner, 31 T.C. 910 (1959) (holding that the taxpayer's activities were sufficient to place him in the real estate development business), affd. 279 F.2d 115 (6th Cir. 1960).

Contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

Decision will be entered under Rule 155.