**O. L. GRAGG and Inez Gragg**

v.

**The UNITED STATES.**

**No. 176–74.**

United States Court of Claims.

March 23, 1977.

---

20. I.R.C. § 483(f)(3).

Harold A. Chamberlain, Houston, Tex., attorney of record, for plaintiff. Chamberlain, Hrdlicka, White & Waters, Houston, Tex., of counsel.

Allan C. Lewis, Washington, D. C., with whom was Acting Asst. Atty. Gen. Myron C. Baum, Washington, D. C., for defendant. Theodore C. Peyser and Donald H. Olson, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and NICHOLS and BENNETT, Judges.

## OPINION

NICHOLS, Judge.

In this tax refund case, plaintiffs urge us to hold that § 1251 of the Internal Revenue Code is constitutionally invalid because in computing a taxpayer's "farm net income" § 1251(e)(2)(B) excludes some gains from calculation of gross income that could otherwise be considered taxable "income" under the sixteenth amendment. Thus, according to plaintiffs Congress has arbitrarily denied these gains their character as income, which plaintiffs contend is constitutionally mandated. For the reasons set forth below, we reject plaintiffs' theory, we hold for the Government and deny plaintiffs' claim for a refund of taxes paid.

The facts of the case are disarmingly straight-forward, especially in relation to the statutory law that applies to them. For many years, including taxable year 1970 which is the subject of this suit, plaintiffs maintained a large herd of breeding cattle incident to their ranching business. It was plaintiffs' practice each November to round up their entire herd, and to segregate their yearling cattle (*i.e.*, those over a year old) for closer observation, in order to evaluate their potential as future breeders. Yearlings that displayed physical characteristics that revealed to plaintiffs their good breeding potential were branded and considered a part of the breeding herd, to the extent needed to maintain the size and quality of that herd. Excess potential and branded breeders, along with other yearlings whose physical development was less desirable, were sold thereafter and not bred. The record shows that plaintiffs have sold yearlings in each year since 1960, at least, and that over the years, plaintiffs have acquired a reputation as suppliers of yearling cattle with good breeding potential. In 1970, plaintiffs sold 1,696 yearlings, which they had considered property used in their trade or business under § 1231(b)(3), as breeding cattle, and paid the tax on the proceeds as indicated for that amount of long-term capital gain, without regard to whether cattle were actually bred, but only with regard to whether they were branded. After auditing plaintiffs' tax return for 1970, defendant imposed upon them an additional tax, based on the application of § 1251 to plaintiffs' farm gains and previous farm losses.

Section 1251, added to the tax law as a part of the Tax Reform Act of 1969, Pub.L. 91–172, 83 Stat. 487, § 211(a), aims to prevent taxpayers engaged in farming from, in effect, converting their ordinary income into capital gains in order to qualify for a lower rate of tax. *See* U.S.Code Cong. & Admin.News, pp. 1708–14 (1969). The Congress had determined, evidently, that the application of certain statutory accounting rules to farming operations afforded some

taxpayers an unfair advantage from the law's comparatively lenient tax burden on capital gains. Such taxpayers could by express provision, § 1231(b)(3), treat livestock held for breeding, etc., purposes as property used in the trade or business,*i.e.*, taxable when sold at capital gains rates. They could deduct from their nonfarm ordinary income, as current expenses, costs of the kind that would be capital in nature for taxpayers engaged in other businesses, for example the expenses of a breeding herd of livestock. See Treas.Reg. § 1.61–4, permitting farmers to apply the "cash method" of accounting to such activities. A typical business taxpayer would have to capitalize the expenses incurred, thus reducing the capital gains to be realized upon the eventual disposition of the asset, but causing no direct reduction of the taxpayer's current tax liability. One who raises breeding livestock, however, may deduct as current expenses all of the costs incurred in raising the herd, plus depreciation. When the animals are later sold, although the gains realized cannot be reduced because the expenses incurred have already been recovered out of current income, the lower rate of tax imposed on capital gains generally represents a significant tax benefit to the taxpayer involved in farming. The advantage is magnified as a taxpayer enters the higher income brackets. That taxpayer could, in effect, elect to pay a lower tax upon his capital gains in order to avoid a higher rate of tax on his ordinary income during the years he held the assets.

Plaintiffs' tax returns for the years 1965–69 reveal how beneficial this system was for them, in practice. With respect to their ranching business done during these years, the plaintiffs were cash-basis taxpayers who, as such, were allowed to deduct currently all the labor, feed, and other expenses incident to raising their breeding herd. From 1965 to 1969, plaintiffs reported gross farm income of $157,319.10, but their accumulated expenses of $948,897.81 generated a net farm loss of $791,578.71. In the same years, plaintiffs reported gains from the sales of yearlings in the amount of $476,243.67, only half of which was taxable

income under the treatment afforded long-term capital gains. See § 1201. Adding the taxable portion of these gains, $238,121.83, to the income plaintiffs received during this period as interest and dividends, $664,439.08, the sum of plaintiffs' ordinary income appears to have been $902,560.91. All but $110,982.20 of this income, however, was offset by plaintiffs' farm losses, which were treated as ordinary deductions. In other words, plaintiffs' investment income and ordinary income from ranching were wholly offset by their farm losses, relieving plaintiffs of any tax liability on those earnings. Plaintiffs' only tax liability, except with respect to their separate business enterprises, was based on the income they derived from selling yearlings, and the tax assessed on that was, at capital gains rates, approximately one-half as much as it would have been on an equivalent amount of ordinary income. It is fair to say, in the broad view at least, that the coincidence of favorable accounting methods for farmers, and favorable tax treatment of capital gains enabled plaintiffs to realize large amounts of income from outside sources, pay no tax on those receipts, reinvest the proceeds in their breeding herd, and pay a tax—and a smaller one at that—only when they later sold some of their cattle. It is clear that this is exactly the situation that Congress viewed as affording an opportunity for abuse, and sought to remedy in § 1251 by restricting the availability of capital gains treatment for the proceeds of livestock sales. Our understanding is confirmed by § 1251 itself, insofar as it excuses from its provisions those farmers who agree to forgo their cash-basis deductions and elect to capitalize the expenses of raising their breeding herds. See § 1251(b)(4).

Congress' cure was to deny capital gains treatment to gains from the sale of certain farm property, most frequently livestock, to the extent that the taxpayer had previously applied current deductions to offset current ordinary income. Such gains are said to be "recaptured" as ordinary income, and not capital gains, in the year the farm property is sold. Section 1251 had a dramatic effect

on plaintiffs' tax situation in the very first year of its operation, 1970. That year plaintiffs earned gross farm profits of $28,746.83, but their deductible farm expenses of $232,892.71 left them a net farm loss of $204,145.88. Plaintiffs also received $95,256.83 from taxable dividends and interest in 1970, which was also wholly offset by their excess deductions. Plaintiffs' other income relevant to this inquiry was $335,503.02 derived from the sales of yearlings, which if treated as capital gains as in prior years would have produced $167,751.51 of taxable income. Of this amount, $108,889.05 could have been offset by the remaining available net farm loss, leaving plaintiffs to pay a tax equivalent to that assessed on only $58,862.46 of ordinary income. It is not difficult to see how Congress could have been offended by such results.

We can hardly doubt, therefore, that Congress aimed § 1251 directly at taxpayers in plaintiffs' situation. Such a missile would not by accident strike its target as accurately as it has in this case. Because plaintiffs had accrued excess farm deductions of $204,145.88, an equivalent amount of their gains from livestock sales cannot qualify for capital gains treatment but must be reported as ordinary income. Added to that sum is one-half of the balance of the sale proceeds, which do qualify for treatment as capital gains. Thus, for purposes of illustration, plaintiffs received $269,824.45 of taxable ordinary income from their ranching business in 1970, rather than the $58,862.42 they reported. The difference between the taxes due on these sums, plus interest, is, in essence, the amount in controversy in this suit. Plaintiffs resist defendant's assessment of this tax deficiency on the ground that § 1251 is unconstitutional.

The statute's complicated mechanism for accomplishing its purpose rests upon the computation of a taxpayer's "excess deductions account," which is generally the excess of the taxpayer's "farm net loss" (which may be used to offset nonfarm income) and his "farm net income." Section

1251(b). The statutory definition of "farm net income" generates no controversy here, but the following definition of "farm net loss" is the target of plaintiffs' constitutional attack:

(2) FARM NET LOSS.— The term "farm net loss" means the amount by which—

(A) the deductions allowed or allowable by this chapter which are directly connected with the carrying on of the trade or business of farming, exceed

(B) the *gross income* derived from such trade or business.

*Gains and losses on the disposition of * * * [certain farm assets] shall not be taken into account.* [§ 1251(e)(2).] [Emphasis supplied.]

Plaintiffs now contend, as they did before the Commissioner and our Trial Judge, that the sixteenth amendment precludes the statute's attempt to disregard the gains from the disposition of farm property from the special computation of gross income in subsection (B) quoted above, for the purpose of determining the "farm net loss."

In response, defendant offers two theories to support the assessed tax liability. First, defendant denies that any constitutional consideration impedes the operation of § 1251. Then, alternatively, defendant maintains that even if § 1251 were void, plaintiffs would still be unentitled to capital gains treatment under § 1231 because the yearlings plaintiffs sold were property they held primarily for sale to customers in the ordinary course of their trade or business, within the meaning of the exception expressed in § 1231(b)(1)(B).

Our detailed discussion of the circumstances surrounding the enactment of § 1251 will help to show why we find it necessary to address plaintiffs' constitutional contention about § 1251 rather than dispose of the case on § 1231 grounds alone. The Trial Judge pursued the latter route.

The Trial Judge noticed that every year since 1960, at least, plaintiffs had sold about 90 percent of their male yearlings. Among those were some that plaintiffs regarded as suitable for future breeding, but which they

did not wish to retain for their own breeding herd. There was evidence that some of these, at least, were put to breeding by their new owners. These facts led the Trial Judge to conclude that plaintiffs had acquired a reputation for raising cattle noted for their outstanding physical characteristics. Plaintiffs' yearlings were sought by ranchers for addition to their own breeding herds. Therefore, the Trial Judge concluded, plaintiffs' selling and, occasionally, trading yearlings was part of their regular ranching business. Consequently, the Trial Judge regarded the yearlings sold as inventory held by plaintiffs for sale to customers in the ordinary course of their business. As such, the yearlings when sold produced ordinary income for plaintiffs and not capital gains as they would if § 1231 applied. Once plaintiffs were deprived of the application of § 1231, further inquiry into § 1251 was unnecessary. The Trial Judge could dispose of the case in defendant's favor without reaching plaintiffs' constitutional objections. But plaintiffs say the provision respecting livestock in § 1231(b)(3) was expressly written to preclude such a result.

Orthodox doctrine discourages us from addressing a constitutional question that could be avoided, but we find it appropriate to be heterodox here. We have examined the pre-1969 situation in such detail in order to appreciate how Congress obviously perceived a "loophole" in the tax law that permitted certain taxpayers, like plaintiffs, to avoid paying what Congress considered their fair share of taxes, and why Congress prescribed § 1251 as a cure. Congress evidently expects us to follow the route it has charted, and not to persist on the old reef-strewn routes it meant to abandon. A taxpayer should not be allowed to divert us by an insubstantial constitutional contention. It seems that the orthodoxy should not have the same force in such a case as this where the constitutional objection to a statute is rejected as it might where the constitutional contention would otherwise prevail. An additional, practical reason for addressing the constitutional question directly, moreover, is that the IRS relied on § 1251 in assessing the tax deficiency, and plaintiffs asserted in their timely refund claim that the statute was unconstitutional. The alternative contention that plaintiffs' yearlings were inventory, not § 1231 property, was raised for the first time, by defendant, before the Trial Judge. The issue is not without difficulties both factual and legal, and we would have to resolve it without aid from the usual presumption that the Commissioner is correct. If defendant prevails on either ground, plaintiffs have not overpaid their taxes and the petition must be dismissed.

At the heart of plaintiffs' constitutional argument is the sixteenth amendment, which states:

The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration. [U.S. Constitution, amend. XVI.]

Plaintiffs point out that the Supreme Court has consistently construed the amendment's language to confer upon Congress broad taxing power, broad enough to reach "income from any source whatsoever" if that was Congress' desire. *E. g., Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483 (1955) and *United States v. Kirby Lumber Co.,* 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131 (1931) (reviewing the constitutionality of § 22(a), the predecessor of current § 61(a)). These cases required the Court to explore the limits of Congressional authority to tax incomes. It is true, of course, that the sixteenth amendment supports a broad construction of the taxing power, whenever Congress chooses to exercise the full measure of its powers. Plaintiffs contend, though, that these decisions establish for the terms "income" as used in the sixteenth amendment, and "gross income" as in § 61(a), a constant, constitutionally mandated meaning from which Congress cannot depart. Plaintiffs would have us conclude that in giving "gross income" a narrower meaning in § 1251(e)(2)(B), quoted above, by excluding certain farm gains, Congress has contravened the sixteenth

amendment and acted inconsistently with § 61(a).

We disagree, for it appears that plaintiffs have misapplied the cited precedents, which do not fix a constitutional definition of "income." The sixteenth amendment is an enabling measure, granting Congress certain powers thought to be lacking. But the Constitution nowhere compels Congress to exercise all of its taxing power or none at all. It is common knowledge, to the contrary, that Congress may classify income depending on its source, and exclude from gross income some of the varieties it has identified. *See* Internal Revenue Code of 1954, §§ 101–24. Since the 1930's, we have known that Congress' limited exercise of its taxing authority is not objectionable, *Avery v. Commissioner*, 84 F.2d 905, 907 (2d Cir. 1936), *citing Denman v. Slayton*, 282 U.S. 514, 51 S.Ct. 269, 75 L.Ed. 500 (1931) (approved exclusion from gross income of interest from certain government obligations). We can perceive no objection, therefore, if this is what Congress did here.

Having accepted plaintiffs' premise that Congress has excluded certain types of receipts from income, and refuted their conclusion that such action would have been unconstitutional, we can now indulge ourselves in questioning the premise. We should not allow plaintiffs to persuade us that Congress has, in fact, excluded any income from taxation. It is obvious that Congress' intent was the opposite, to increase plaintiffs' tax burden, not to diminish it, and it chose to do so by taxing more of their income not less. To implement Congress' substantive intent, its draftsmen employed a definition, as legislative draftsmen often do. Plaintiffs' objection is to the mere form of the language Congress used, for they conceded at oral argument that Congress could have accomplished the result without objection if the draftsmen had used different words. There is no confusion over what was the legislative aim, nor any doubt that the purpose was within Congress' constitutional power. That being the case, we recall Holmes' words on the subject:

* * * [W]hen the legislature clearly indicates that it means to accomplish a certain result within its power to accomplish, it is our business to supply any formula that the *elegantia juris* may seem to require. * * * [*Hoeper v. Tax Commission*, 284 U.S. 206, 220, 52 S.Ct. 120, 123–124, 76 L.Ed. 248 (1931) (dissenting opinion).]

Our business today is to permit the cure Congress prescribed to take effect.

IT IS THEREFORE CONCLUDED AND ORDERED that plaintiffs are not entitled to recover and their petition is dismissed.