THE ARMENDARIS CORPORATION (FORMERLY ARMENDARIS LAND DEVELOPMENT CORPORATION), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7938–76.     Filed April 4, 1979.

*Reed O. Gentry* and *Jack B. Robertson,* for the petitioner.
*James E. Cannon,* for the respondent.

SCOTT, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for its fiscal year ending April 30, 1971, in the amount of $150,605.72. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for decision the following:

(1) Whether the provisions of section 1251, I.R.C. 1954,[1] apply to dispositions of farm property by petitioner during its fiscal year ending April 30, 1971, so as to cause the gain from such dispositions to be treated as ordinary income rather than capital gain.

(2) If it is determined that under section 1251 the gain derived by petitioner in its fiscal year ending April 30, 1971, from the sale of breeding cattle held by petitioner for more than 24 months is not to be treated as ordinary income, is the gain from these sales ordinary income from the sale of property held primarily for sale to customers in the ordinary course of petitioner's trade or business?[2]

If we conclude that section 1251 applies to the disposition of farm property by petitioner in its fiscal year 1971, so as to cause the gain from such sales to be treated as ordinary income, the

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

[2] In this case, petitioner is taking the position that items determined by respondent to be capital gain and certain items it reported on its tax return as capital gain should be treated as ordinary income. This, of course, is contra to the usual situation of respondent's taking the position that items the taxpayer contends constitute capital gain should be treated as ordinary income. The reason for the positions of the parties here as to whether certain of petitioner's gains are capital gains or ordinary income is because petitioner's net long-term capital gains for its fiscal year 1971 as computed by both petitioner and respondent exceed petitioner's total income for that year, including these capital gains. Therefore, since under sec. 1201(a)(1)(A), I.R.C. 1954, as applicable to 1971, the tax on petitioner's taxable income reduced by its capital gains was zero, petitioner's alternative tax computed under sec. 1201(a) is 28 percent for the period of its fiscal year prior to Jan. 1, 1971, and 30 percent for the period after Dec. 31, 1970, of its net long-term capital gains. To the extent petitioner can reduce its long-term capital gains without reducing such gains sufficiently to result in some taxable income after reduction of its taxable income by its net long-term capital gains, it reduces its income tax by 28 to 30 percent of the total amount considered ordinary income rather than long-term capital gain.

following issues arise in determining the amount, if any, of such ordinary income:

(1) On which of its properties was petitioner engaged in the trade or business of farming during its fiscal year 1971 and the amount, if any, of the farm net loss it incurred in that year.

(2) Whether a ranch sold by petitioner, together with grasses and hay growing thereon, constitute "farm recapture property" within the meaning of section 1251 and the amount, if any, of the gain from the sale of the ranch, which is properly allocable to the sale of unharvested crops on the property when it was sold.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

The Armendaris Corp., formerly Armendaris Land Development Corp. (referred to hereinafter as petitioner), is a corporation organized and existing under the laws of Delaware with its principal place of business in Kansas City, Mo. Using the cash receipts and disbursements method of accounting, petitioner timely filed a U. S. Corporation Income Tax Return (Form 1120) for its fiscal year ending April 30, 1971, with the Internal Revenue Service Center in Kansas City. On January 15, 1973, petitioner filed an amended U. S. Corporation Income Tax Return with the District Director of Internal Revenue, Kansas City, Mo.

Petitioner was incorporated on August 22, 1969. On October 10, 1969, in an exchange pursuant to section 351, approximately 1,060,000 acres of rural land located in California, Colorado, Kansas, Missouri, Montana, New Mexico, and Wyoming (of which about 327,000 acres represented rural land under revocable Government grazing leases and permits and under private leases), 550,000 square feet (land area) of urban real estate in Kansas City, Mo., and various herds of breeding cattle consisting of 27,785 head (of which 14,798 were sold by the company prior to December 31, 1969) were transferred to petitioner in exchange for 997,098 shares of its common stock and, in the case of one cattle herd, a $400,000 debenture. The organization of petitioner and the acquisition by it of the original properties were accomplished primarily through the efforts of Oppenheimer Industries, Inc., Kansas City, Mo. (hereinafter sometimes referred to as Oppenheimer), a firm active in management

operations and advisory services involving ranches, cattle, and urban real estate.

A preliminary prospectus dated February 20, 1970, states that petitioner intended—"to engage in many phases of real estate and cattle operations, including the development, purchase and sale of rural and urban properties, the leasing and supervision of the operations of ranches and farms, a proposed Mexican cattle importation operation and the financing of activities relating to cattle operations." In addition, the prospectus states that petitioner intended to explore various methods of developing the potential for recreational, residential, or commercial development that might be inherent in any of the properties held by petitioner.

Under the terms of an agency agreement entered into as of October 1, 1969, between petitioner and Oppenheimer, Oppenheimer became petitioner's agent. Oppenheimer agreed: (1) To act as petitioner's real estate broker for the sale of properties held by petitioner; (2) to negotiate for the lease of properties held by petitioner; (3) to supervise the management of petitioner's real estate; (4) to supervise petitioner's breeding and feeder cattle operations and other livestock operations and to act as petitioner's attorney in fact with full power to execute, on petitioner's behalf, contracts or agreements to buy or sell breeding and feeder cattle or other livestock; (5) to supervise and manage the placement and/or processing of cattle; and (6) to provide general administrative services and mortgages for petitioner.

With respect to the breeding herd acquired in the tax-free exchange, petitioner determined that corporate ownership of breeding cattle in the absence of individual tax incentives made available under the Internal Revenue Code produced a marginal rate of return and that a greater return on its investment could be obtained through cattle financing operations and other activities. Accordingly, petitioner planned to sell all of its cattle within a few years, the timing and rate of reduction of petitioner's breeding cattle to be dependent upon prevailing market conditions and petitioner's cash requirements. A statement with respect to petitioner's intention to dispose of its breeding herd was contained in the preliminary prospectus accompanying petitioner's registration statement under the Securities Act of 1933.

Most of the cattle in the breeding herd acquired by petitioner in the tax-free exchange had been owned by persons who had employed Oppenheimer as their agent in connection with their agricultural investments. The breeding herd consisted of: (1) 16,738 head of breeding cattle of various ages; (2) 5,579 head of heifer calves; and (3) 5,468 head of steer [sic] calves. Most of the cattle owned by petitioner were maintained under annually renewable cattle maintenance contracts by local ranchers and farmers on properties not owned by petitioner. These contracts were incentive-type contracts, under which the cattle owner supplied the cattle and the feed. The farmer or rancher provided all the necessary labor. The contracts provided for payment to the ranchers and farmers on the basis of annual weight gain of the cattle. With respect to cows, first-calf heifers and bred yearlings, the fee was computed on the aggregate weight of calves borne to such animals, and the rancher or farmer was obligated to pay a negotiated amount (usually around $200 per animal) as an indemnity in the event of death losses of the mature animals in excess of 6 percent. On open yearlings and heifer calves, the maintenance fee was based on the weight gain of the individual animal. Oppenheimer attempted to manage the breeding cattle operation so that the owner would be deemed to be engaged in the business of farming for profit and could deduct operation expenses and depreciation on its breeding cattle on its Federal income tax return.

Oppenheimer advised petitioner, as well as other clients, that problems could arise with respect to the management of the breeding herd by contract ranchers. These problems included such things as the contract ranchers' occasional inability to fulfill the terms of their contracts, including such provisions as a guarantee against dead or missing cattle or refunds arising from adjustments of contracts for poor performance. Oppenheimer advised its clients that the removal and replacement of cattle with different contract ranchers might be necessary when problems arose. Oppenheimer advised its clients that problems with contract ranchers should not have any material adverse impact, although it could give no assurance to this effect. Oppenheimer normally recommended that its clients contract for 1 year or less with a contract rancher. This gave Oppenheimer's clients leverage over contract ranchers by reason of the client's right to cancel the contract if performance proved

unsatisfactory. Oppenheimer normally recommended that incentive-type contracts be entered into with contract ranchers, as this type of contract produced better operational results than the cost-plus type of contract, which was widely used in the industry. Incentive-type contracts passed to the rancher the substantial part of the risk of weather, disease, and mortality.

Petitioner's breeding herd was disposed of over a period of approximately 3 years. The herd was distributed over a wide geographical area. Petitioner did not intend to replace the breeding herd disposed of or to acquire an additional breeding herd. Petitioner did breed some of the cows in the breeding herd to facilitate their sale, as bred cows yielded a higher sales price than unbred cows. Generally, however, petitioner sold all of its calf crop each year. This manner of liquidation was inconsistent with the idea of maintaining a breeding herd.

During its taxable years ending April 30, 1970, 1971, and 1972, petitioner consistently reported as long-term capital gain the sales of the breeding cattle held for breeding purposes for more than 12 months (24 months in the case of breeding cattle acquired after December 31, 1969). Petitioner also claimed as deductions in the computation of its taxable income depreciation and breeding fees attributable to the breeding herd. During the taxable year ending April 30, 1971, petitioner reported on its U. S. corporation income tax return, as amended, a realized long-term capital gain from the sale of breeding cattle of $322,987. During the same period, petitioner had ordinary income from the sale of cattle of $272,991.

In its consolidated balance sheet as of December 31, 1969, petitioner reported as an asset its inventory of breeding cattle acquired in the tax-free reorganization and placed an acquisition value thereon of $2,003,405. This consolidated balance sheet was examined and certified as having been made in conformity with generally accepted accounting practices by Lybrand, Ross Bros. & Montgomery, the certified public accounting firm which prepared petitioner's income tax returns. According to notes following the consolidated financial statement, depreciation of the breeding cattle was computed by the straight-line method over the productive lives of the cattle ranging from 2 to 8 years.

The following schedule reflects the rural properties which petitioner acquired in the section 351 exchange that were still

owned by it during all or part of the taxable year ending April 30, 1971:

| Name and location | Deeded | Private and State leases | Federal permit | Total |
|---|---|---|---|---|
| | | Acreage | | |
| Armendaris—southwestern New Mexico | 438,295 | --- | 11,500 | 449,795 |
| Hachita—southwestern New Mexico ... | 168,150 | 37,043 | 119,615 | 324,808 |
| Border—southwestern New Mexico ..... | 6,331 | 12,956 | 51,840 | 71,127 |
| Carrizo—southern California | 30,793 | 2,440 | 3,791 | 37,024 |
| American—southern California | 4,800 | --- | --- | 4,800 |
| Washburn—southern California | 5,150 | --- | 1,960 | 7,110 |
| Whitehall—western Montana | 5,640 | 960 | --- | 6,600 |
| Mission Farms—east-central Kansas ... | 626 | --- | --- | 626 |
| Brosal—south-central Colorado | 8,110 | 18,170 | 320 | 26,600 |
| Bunting, a.k.a. Charlie Horse (undivided one-half interest) Missouri-Kansas border | 2,120 | --- | --- | 2,120 |
| Meiss—northern California | 13,200 | --- | --- | 13,200 |
| McIlvaine, a.k.a. Lazy CJ Encampment—southern Wyoming ..... | 18,350 | 6,225 | 25,960 | 50,535 |
| Mar-Tuc—southern California | 240 | --- | --- | 240 |

During the taxable year ending April 30, 1971, petitioner was engaged in the business of farming with respect to the Meiss and Mar-Tuc properties. Petitioner's remaining rural properties were leased on a short-term basis to local ranchers and farmers, a course of action which petitioner had pursued since acquisition of the properties and that it intended to pursue unless the rural properties were developed for another purpose. The rental on the rural properties was negotiated either as a fixed rent or on the basis of a unit of animal carrying capacity (animal unit). An animal unit is the amount of land in a given area necessary to carry a cow and its spring calf for a 12-month period without requiring the purchase of a substantial quantity of supplementary feed. Petitioner followed the practice of maintaining and, in some cases, increasing the carrying capacity of its ranches through water development programs, construction of corrals and handling facilities, brush clearance, reseeding, fencing, and similar operations. In December 1969, petitioner estimated that it would expend approximately $500,000 over the succeeding 3 years for such purposes in the expectation that these expendi-

tures would increase the rents receivable from the ranch properties.

Generally, the leases in effect during the taxable year ending April 30, 1971, on petitioner's ranch and farm properties had been negotiated by Oppenheimer using standardized contracts, either as petitioner's agent or in case of leases assigned to petitioner in the reorganization as agent for the individuals, corporations, or partnerships which had conveyed the properties to petitioner. Aside from payment of rent, under most of these leases the lessee was obligated at its expense to:

(1) Maintain public liability and property damage insurance applicable to the premises;

(2) Protect, indemnify, and save lessor harmless against all liabilities, resulting from the failure on the part of the lessee to perform or comply with any of the terms of the lease;

(3) Indemnify lessor in case of action, suit, or proceeding;

(4) To use the premises only for the purpose designated in the lease and to care for, maintain, and repair the premises, which included:

(a) keeping the premises and all improvements in good order;

(b) conforming to and observing all laws;

(c) not permitting waste or nuisance;

(d) maintaining all fences in good condition;

(e) making reasonable efforts to control the growth of noxious weeds and growth of brush;

(f) maintaining the roads;

(g) exercising the diligence and competence reasonably expected of a prudent rancher observing normal agricultural standards;

(h) not removing or allowing to be removed any fences, improvements, trees, or shrubs;

(i) promptly delivering possession of the premises at the expiration or termination of the lease; and

(j) permitting the lessor reasonable entry to inspect and do anything the lessee is required to and has failed to do.

Additionally, the lessee contracted that:

(5) He was familiar with the physical condition of the premises and acknowledged that the same were received in good and clean order;

(6) Lessor made no representations or warranty with respect

to the condition of the premises or their fitness for any particular purpose;

(7) Nothing in the lease constituted any consent or request by lessor for performance of any labor or services or the furnishing of any material or other property in respect to the premises. Additionally, the lessee did not have the authority to obligate the lessor for any such items;

(8) Upon failure of the lessee to perform his covenants, the lessor had the right without notice to the lessee to perform such acts for the account and at the expense of the lessee;

(9) He could not assign or otherwise transfer without consent of the lessor any rights to the lease;

(10) With respect to improvements, the lessor could make improvements at the cost and expense of the lessor but the making of such improvements was in the sole discretion of the lessor. The following improvements made by the lessee (following consent by the lessor) were to be paid for by the lessee:

(a) all major repairs to buildings such as roof, wall, foundation, electrical, and plumbing;

(b) all new fence construction and fence repairs; and

(c) all new construction and major repair of ponds, wells, reservoirs, etc.

The number of cattle to be maintained on the premises was either set at a fixed number which could not be exceeded or the lessee agreed to keep and graze the maximum number of cattle that the ranch could sustain in accordance with good and acceptable ranch management. Disputes as to the carrying capacity were to be settled by the head of the office of Bureau of Land Management (hereinafter referred to as BLM) having jurisdiction over BLM lands attached to the ranch. For purposes of computing rent on an AUM (animal unit month) or AUY (animal unit year) basis, the specified carrying capacity determined the number of cattle for which rent would be charged.

The lessor:

(1) Reserved the right to terminate the lease should a substantial portion of the property be condemned;

(2) Was obligated to pay real estate taxes; however, Oppenheimer-negotiated leases usually provided that, in addition to rents provided for, the lessee would either reimburse the lessor

or share increases in the real estate taxes during the term of the lease;

(3) Was to carry fire and extended coverage insurance on improvements;

(4) In some instances, was to provide a renewal option in the lease provided the lessee continued to run cattle under contracts with Oppenheimer in a manner suitable to Oppenheimer;

(5) Reserved exclusive right to prospect, drill, produce, mine, extract, remove minerals; and

(6) Would use its best efforts to renew grazing leases on State and Federal land; however, the loss of such land did not affect the payment of rent called for, void the lease, or change any terms unless a substantial loss of grazing leases or rights were affected.

On rural properties on which there were agricultural crops grown, the Oppenheimer standardized lease either provided for a fixed rental without reference to production or entitled petitioner to a fixed percentage of the gross value of the crop produced. Generally where the agricultural leases called for a receiving of a percentage, the lessee was required to submit a plan of farm operations for petitioner's approval. Agricultural leases calling for fixed rental contained no such provisions.

In all incidences of either separate leases for a portion of property leased by petitioner (1) on a sharecrop basis and (2) with respect to animal grazing activities, or one lease covering both activities, petitioner was unable to segregate the income, expenses, and related net income or loss attributable to the respective activity.

On June 29, 1970, petitioner sold the Hachita Ranch. On its U. S. corporation income tax return for the year ending April 30, 1971, petitioner reported a long-term capital gain of $3,024,481 from the sale of the ranch. In addition, petitioner reported long-term capital gain and ordinary income in the respective amounts of $140,000 and $394,369 from the disposition of depreciable property and real property held for more than 6 months pursuant to section 1245. Under section 1250 petitioner also reported ordinary income of $11,854 from the disposition of depreciable real property held for more than 6 months (the dwelling on the Hachita Ranch). Petitioner did not report any income as having been received from the sale of unharvested crops in the form of grasses and hay for animal feed. Neither at

the time the Hachita Ranch was acquired nor at the time of its sale did petitioner make an allocation in the sales contract with respect to any unharvested crops in the form of grasses and hay for animal feed.

Petitioner on its Federal income tax return for the year ending April 30, 1971, reported a farm net loss of $566,575 and an ordinary gain under section 1251(c) of $566,575 from the disposition of "farm recapture property" as defined by section 1251(e)(1). This sum consisted of:

(1) $322,987 from the sale of breeding cattle held for 24 months or more;

(2) $140,000 from the sale of property (Hachita Ranch) used in the trade or business as described in section 1231(b)(1); and

(3) $103,588 from the sale of certain unharvested crops on the Hachita Ranch in the form of grasses and hay for animal feed as described in section 1231(b)(1).

On its tax return for its fiscal year 1971, petitioner reported taxable income of $2,764,120 and an excess of net long-term capital gain over net short-term capital loss in the amount of $2,966,640. This amount was arrived at as set forth below by subtracting from capital gain of $3,533,215 the amount of $566,575 of section 1251 recapture of farm net loss.

Petitioner computed its regular tax, without regard to a tax surcharge and minimum tax as follows:

*Regular tax*

| | | | |
|---|---|---|---|
| 1. | | Taxable income | $2,764,120 |
| 2. | | Less: Surtax exemption | 25,000 |
| 3. | | | 2,739,120 |
| 4. | (a) | 22% of line 1 | 608,107 |
| | (b) | 26% of line 3 | 712,171 |
| | (c) | Total | 1,320,278 |

Petitioner computed its alternative tax as follows:

| | |
|---|---|
| Long-term capital gains | $3,533,215 |
| Less: Farm recapture property (sec. 1251 recapture of $566,575 farm net loss) | 566,575 |
| | 2,966,640 |

| | |
|---|---|
| 28% of $2,966,640 ........................................... | 830,659 |
| Fiscal year factor ......................................... | .6712 |
| ($830,659 × .6712) ...........$557,538 | |
| 30% of $2,966,640 ........................................ | 889,992 |
| Fiscal year factor ........................................ | .3288 |
| ($889,992 × .3288) ........... 292,629 | |
| Alternative tax ........................................... | 850,167 |

Respondent in his notice of deficiency increased petitioner's reported capital gain by the $566,575 by which petitioner had decreased its reported capital gain for section 1251 recapture of farm net loss. Respondent computed petitioner's income tax as the alternative tax provided for in section 1201(a), using as petitioner's net long-term capital gain petitioner's capital gain without any reduction for section 1251 recapture of net farm loss. Respondent explains his adjustment as follows:

It is determined that after applying the limitations of section 1251(c)(2) of the Internal Revenue Code of 1954, you did not realize any ordinary income under section 1251 from the disposition of "farm recapture property." Alternatively, you realized gains described in section 1251(c)(1) of the Internal Revenue Code of 1954 to the maximum extent of $322,987.00 realized from the sale of cattle. Therefore, capital gain income is increased $566,575.00 and ordinary income is decreased $566,575.00.

### OPINION

Section 1251,[3] which was added to the Code by the Tax Reform

---

[3]Sec. 1251 provides, in part, as follows:

SEC. 1251. GAIN FROM DISPOSITION OF PROPERTY USED IN FARMING WHERE FARM LOSSES OFFSET NONFARM INCOME.

(a) CIRCUMSTANCES UNDER WHICH SECTION APPLIES.—This section shall apply with respect to any taxable year only if—

(1) there is a farm net loss for the taxable year, or

(2) there is a balance in the excess deductions account as of the close of the taxable year after applying subsection (b)(3)(A).

(b) EXCESS DEDUCTIONS ACCOUNT.—

(1) REQUIREMENT.—Each taxpayer subject to this section shall, for purposes of this section, establish and maintain an excess deductions account.

(2) ADDITIONS TO ACCOUNT.—

(A) GENERAL RULE.—There shall be added to the excess deductions account for each taxable year an amount equal to the farm net loss.

\*       \*       \*       \*       \*       \*       \*

(D) NONFARM ADJUSTED GROSS INCOME.—For purposes of this section, the term "nonfarm adjusted gross income" means adjusted gross income (taxable income, in the case of an electing small business corporation) computed without regard to income or deductions attributable to the business of farming.

(E) TERMINATION OF ADDITIONS.—No amount shall be added to the excess deductions account for any taxable year beginning after December 31, 1975.

Act of 1969, Pub. L. 91–172, 83 Stat. 487, provides for the treatment of the gain from the sale of certain property used in

.

(3) SUBTRACTION· FROM ACCOUNT.—If there is any amount in the excess deductions account at the close of any taxable year (determined before any amount is subtracted under this paragraph for such year) there shall be subtracted from the account—

(A) an amount equal to the farm net income for such year, plus the amount (determined as provided in regulations prescribed by the Secretary) necessary to adjust the account for deductions which did not result in a reduction of the taxpayer's tax under this subtitle for the taxable year or any preceding taxable year, and

(B) after applying paragraph (2) or subparagraph (A) of this paragraph (as the case may be), an amount equal to the sum of the amounts treated, solely by reason of the application of subsection (c), as ordinary income.

\* \* \* \* \* \* \*

(4) EXCEPTIONS FOR TAXPAYERS USING CERTAIN ACCOUNTING METHODS.—

(A) GENERAL RULE.—Except to the extent that the taxpayer has succeeded to an excess deductions account as provided in paragraph (5), additions to the excess deductions account shall not be required by a taxpayer who elects to compute taxable income from farming (i) by using inventories, and (ii) by charging to capital account all expenditures paid or incurred which are properly chargeable to capital account (including such expenditures which the taxpayer may, under this chapter or regulations prescribed thereunder, otherwise treat or elect to treat as expenditures which are not chargeable to capital account).

(B) TIME, MANNER, AND EFFECT OF ELECTION.—An election under subparagraph (A) for any taxable year shall be filed within the time prescribed by law (including extensions thereof) for filing the return for such taxable year, and shall be made and filed in such manner as the Secretary shall prescribe by regulations. Such election shall be binding on the taxpayer for such taxable year and for all subsequent taxable years and may not be revoked except with the consent of the Secretary.

(C) CHANGE OF METHOD OF ACCOUNTING, ETC.—If, in order to comply with the election made under subparagraph (A), a taxpayer changes his method of accounting in computing taxable income from the business of farming, such change shall be treated as having been made with the consent of the Secretary and for purposes of section 481(a)(2) shall be treated as a change not initiated by the taxpayer.

\* \* \* \* \* \* \*

(c) ORDINARY INCOME.—

(1) GENERAL RULE.—Except as otherwise provided in this section, if farm recapture property (as defined in subsection (e)(1)) is disposed of during a taxable year beginning after December 31, 1969, the amount by which—

(A) in the case of a sale, exchange, or involuntary conversion, the amount realized, or

(B) in the case of any other disposition, the fair market value of such property,

exceeds the adjusted basis of such property shall be treated as ordinary income. Such gain shall be recognized notwithstanding any other provision of this subtitle.

(2) LIMITATION.—

(A) AMOUNT IN EXCESS DEDUCTIONS ACCOUNT.—The aggregate of the amounts treated under paragraph (1) as ordinary income for any taxable year shall not exceed the amount in the excess deductions account at the close of the taxable year after applying subsection (b)(3)(A).

(B) DISPOSITIONS TAKEN INTO ACCOUNT.—If the aggregate of the amounts to which paragraph (1) applies is limited by the application of subparagraph (A), paragraph (1) shall apply in respect of such dispositions (and in such amounts) as provided under regulations prescribed by the Secretary or his delegate.

(C) SPECIAL RULE FOR DISPOSITIONS OF LAND.—In applying subparagraph (A), any gain on the sale or exchange of land shall be taken into account only to the extent of its potential gain (as defined in subsection (e)(5)).

(d) EXCEPTIONS \* \* \*

\* \* \* \* \* \* \*

(3) CERTAIN CORPORATE TRANSACTIONS.—If the basis of property in the hands of a transferee is

the business of farming, which otherwise would be capital gain, as ordinary income to the extent that farm net losses have been used to reduce the taxpayer's tax from nonfarm income. The section was enacted to eliminate abuse by taxpayers of the special accounting rules for farmers. Since farmers are allowed to currently deduct expenses which are capital in nature, but upon the sale of the asset to which such expenditures relate receive capital gain, significant tax advantages can result to such taxpayers. Because of these tax advantages, some taxpayers carry on a limited amount of farming activity to obtain a tax loss, which is deductible from their nonfarm income. Where the loss arises from the deduction of capital costs, these taxpayers in effect convert ordinary income into capital gains. See H. Rept. 91–413 (1969), 1969–3 C.B. 200, 240. *Taylor v. Commissioner*, 67 T.C. 1071, 1078 (1977).

Section 1251(a) provides for the applicability of the section

---

determined by reference to its basis in the hands of the transferor by reason of the application of section 332, 351, 361, 371(a), or 374(a), then the amount of gain taken into account by the transferor under subsection (c)(1) shall not exceed the amount of gain recognized to the transferor on the transfer of such property (determined without regard to this section). This paragraph shall not apply to a disposition to an organization (other than a cooperative described in section 521) which is exempt from the tax imposed by this chapter.

  *   *   *   *   *   *   .*

(e) DEFINITIONS.—For purposes of this section—

(1) FARM RECAPTURE PROPERTY.—The term "farm recapture property" means—

(A) any property (other than section 1250 property) described in paragraph (1) (relating to business property held for more than 6 months), (3) (relating to livestock), or (4) (relating to an unharvested crop) of section 1231(b) which is or has been used in the trade or business of farming by the taxpayer or by a transferor in a transaction described in subsection (b)(5), and

(B) any property the basis of which in the hands of the taxpayer is determined with reference to the adjusted basis of property which was farm recapture property in the hands of the taxpayer within the meaning of subparagraph (A).

(2) FARM NET LOSS.—The term "farm net loss" means the amount by which—

(A) the deductions allowed or allowable by this chapter which are directly connected with the carrying on of the trade or business of farming, exceed

(B) the gross income derived from such trade or business.

Gains and losses on the disposition of farm recapture property referred to in section 1231(a) (determined without regard to this section or section 1245(a)) shall not be taken into account.

(3) FARM NET INCOME.—The term "farm net income" means the amount by which the amount referred to in paragraph (2)(B) exceeds the amount referred to in paragraph (2)(A).

(4) TRADE OR BUSINESS OF FARMING.—

(A) HORSE RACING.—In the case of a taxpayer engaged in the raising of horses, the term "trade or business of farming" includes the racing of horses.

(B) SEVERAL BUSINESSES OF FARMING.—If a taxpayer is engaged in more than one trade or business of farming, all such trades and businesses shall be treated as one trade or business.

(5) POTENTIAL GAIN.—The term "potential gain" means an amount equal to the excess of the fair market value of property over its adjusted basis, but limited in the case of land to the extent of the deductions allowable in respect to such land under sections 175 (relating to soil and water conservation expenditures) and 182 (relating to expenditures by farmers for clearing land) for the taxable year and the 4 preceding taxable years.

with respect to any taxable year only if there is a farm net loss for the year or a balance in the excess deductions account as of the close of the year. Section 1251(b) requires taxpayers who sustain farm net losses to maintain an excess deductions account (EDA). Under subsection 1251(b)(2)(A), there is added to the EDA for each taxable year an amount equal to the taxpayer's farm net loss for the year. Subsection 1251(b)(3)(A) provides for the subtraction from the EDA at the close of the year of an amount equal to the farm net income for the year plus any amounts necessary to adjust the EDA for deductions that did not result in a tax benefit for the tax year or any preceding taxable year. If the taxpayer disposes of farm recapture property, as defined in subsection 1251(e)(1), gain recognized on the disposition of the farm recapture property which would ordinarily be treated as capital gain is treated under subsection 1251(c) as ordinary income to the extent of the amount in the EDA at the close of the taxable year after the subtraction therefrom in accordance with section 1251(b)(3)(A) of farm net income and amounts necessary to adjust for deductions that did not result in a tax benefit.

During the taxable year at issue herein, petitioner claimed that it had a farm net loss of $566,575. While respondent questions petitioner's computation of this farm net loss, he contends that, even if petitioner did sustain such a farm net loss, it did not have any amount in its EDA at the close of its fiscal year 1971 after the reductions of the EDA required by section 1251(b)(3)(A) for deductions that did not result in any tax benefit for its fiscal year 1971 or any prior fiscal year. Since petitioner's fiscal year 1971 was its first year to which the provisions of section 1251 were applicable, petitioner had no EDA except such as might arise in its fiscal year 1971. Under section 1251(b)(2)(A) petitioner's farm net loss, if any, for its fiscal year 1971 would be added to its EDA. Under section 1251(b)(3) petitioner's EDA would be reduced by its farm net income, if any, for its fiscal year 1971 plus "the amount * * * necessary to adjust the account for deductions which did not result in a reduction of the taxpayer's tax under this subtitle for the taxable year." It is respondent's position that any amount of farm net loss by which petitioner's EDA was increased under section 1251(b)(2)(A) for its fiscal year 1971 would also be the amount by which its EDA would be reduced under section

1251(b)(3)(A) since any farm net loss which petitioner sustained in its fiscal year 1971 did not result in a reduction in its income tax for that year. Respondent argues that this result arises because petitioner's tax for its fiscal year 1971 is the alternative tax computed under section 1201(a) since such amount is less than petitioner's tax otherwise computed. Petitioner contends that at the end of its taxable year 1971 it had a balance in its EDA in an amount equal to its farm net loss. Petitioner contends that under the provisions of section 1251(a)(2), section 1251(c) applies to the gain realized upon disposition of its farm recapture property, causing this gain to be treated as ordinary income. Petitioner argues that since its gain on farm recapture income is treated under section 1251(c) as ordinary income, the amount of that gain should not be included as part of its net long-term capital gain on which the alternative tax was calculated.

The issue between the parties is whether there was a balance in petitioner's EDA at the end of its 1971 fiscal year after making the subtraction required by section 1251(b)(3)(A). That section provides that the amounts necessary to adjust the EDA for deductions which did not result in a reduction of the taxpayer's tax are to be determined in accordance with "regulations prescribed by the Secretary."

Section 1.1251–2(c)(1) and (3), Income Tax Regs.,[4] specifies the

---

[4]Sec. 1.1251–2(c)(1) and (3), Income Tax Regs., provides, in pertinent part, as follows:

Sec. 1.1251–2(c) *Subtractions from account*—(1) *General rule.* Under section 1251(b)(3), if there is any amount in the excess deductions account at the close of a taxable year (determined after making any addition required under paragraph (b) of this section for such year but before making any reduction under this paragraph for such year), then the excess deductions account shall be reduced (but not below zero) by subtracting—

(i) An amount equal to *(a)* the farm net income (as defined in section 1251(e)(3) and in paragraph (c) of sec. 1.1251–3) for such year, plus *(b)* the amount (as determined in subparagraph (3) of this paragraph) necessary to adjust the account for deductions for any taxable year which did not result in a reduction of the taxpayer's tax under subtitle A of the Code for such taxable year or any preceding taxable year, and

(ii) After making any addition to the excess deductions account under paragraph (b) of this section and any reduction under subdivision (i) of this subparagraph for the taxable year, an amount equal to the sum of the amounts recognized as ordinary income solely by reason of the application of section 1251(c)(1). See Section 1251(b)(3)(B). Thus, no amount shall be subtracted under this subdivision for gain recognized by reason of the application of section 1245(a)(1) or 1252(a)(1). For effect on computation of farm net loss or income of gain recognized under section 1245(a)(1) upon a disposition of farm recapture property, see paragraph (b)(2) of sec. 1.1251–3. In the case of an installment sale of farm recapture property, the taxpayer's excess deductions account shall be reduced under this subdivision in the year of such sale by an amount equal to the gain (computed in the year of sale) to be recognized as ordinary income under section 1251(c)(1).

\*     \*     \*     \*     \*     \*     \*

amounts to be subtracted from the EDA to reflect deductions for the taxable year which did not result in a reduction of the taxpayer's tax. Section 1.1251–2(c)(3)(i), Income Tax Regs., specifically provides that the subtraction for deductions that did not result in a reduction in the taxpayer's tax "shall be made before determining the amount of gain to which section 1251(c) applies," i.e., the amount of gain to be treated as ordinary income. While the regulations are specific as to when the reduction is made for deductions that did not result in tax benefits and provide for adjustments for net operating loss carryovers, they do not specifically define the phrase "deductions that did not result in a reduction of the taxpayer's tax for the taxable year." Respondent contends that where a taxpayer's tax is the alternative tax computed under section 1201(a) and there is no income after reduction of taxable income by the amount of net long-term capital gain so that the alternative tax

---

(3) *Amount necessary to adjust the excess deductions account with respect to deductions which did not result in a reduction of the taxpayer's tax*—(i) *In general.* Under section 1251(b)(3)(A), a subtraction is made from the excess deductions account to adjust the account for deductions that did not result in a reduction of the taxpayer's tax for the taxable year or any preceding taxable year. The amounts to be subtracted are determined under subdivisions (ii) and (iii) of this subparagraph in accordance with the rules in subdivision (iv) of this subparagraph. This subtraction shall be made before determining the amount of gain to which section 1251(c) applies. The amount subtracted under subdivision (ii) of this subparagraph is a temporary subtraction made solely to determine the amount in the excess deductions account for purposes of the limitation in section 1251(c)(2).

(ii) *Temporary subtraction.* The amount temporarily subtracted from the excess deductions account for a taxable year is the sum of the farm portion of *(a)* any net operating loss for such taxable year which does not reduce taxable income (computed without regard to the deduction under section 172(a)) in a prior year, and *(b)* any net operating loss from a prior taxable year which is carried to such taxable year but which does not reduce taxable income (computed without regard to the deduction under section 172(a)) in such taxable year.

(iii) *Permanent subtraction.* The amount permanently subtracted from the excess deductions account for a taxable year is the excess of the farm portion of any net operating loss which may be carried to the preceding year (reducing by the portion of such loss which reduced taxable income (computed without regard to the deduction under section 172(a)) for such preceding year) over the amount of such loss which may be carried to the taxable year, but the subtraction shall not be made earlier than the taxable year in which the excess deductions account is increased by reason of such loss.

(iv) *Rules of application.* For purposes of this subparagraph, the following rules shall apply:

*(a)* The farm portion of a net operating loss is that portion of such loss attributable to the trade or business of farming. Such portion and the remaining portion (hereinafter referred to as the nonfarm loss) shall be absorbed pro rata. If a farm net loss is not added to the excess deductions account in the year in which such loss occurs, the net operating loss (if any) for such year shall be treated as a nonfarm loss.

\*      \*      \*      \*      \*      \*      \*

*(c)* The amounts considered as reducing taxable income under subdivision (ii) of this subparagraph in the taxable year shall be determined on the basis of a tentative computation of taxable income for such year in which the gain realized from the disposition of property to which section 1251(c)(1) applies shall be computed without regard to the excess deductions account limitation.

is solely a percent of capital gain, the deductions of the farm net loss in the computation of taxable income other than capital gain does not result in any reduction in the taxpayer's tax.

We agree with respondent on the facts here present which show that petitioner's tax computed on the alternative basis of section 1201(a) is the same whether its income is reduced by a farm net loss of $566,575 or not. Petitioner argues that to accept respondent's interpretation would make section 1251 inapplicable to any taxpayer whose tax was computed on the basis of the alternative tax as provided for in section 1201(a). We do not decide whether in fact this is the result of the reduction in the EDA required under section 1251(b)(3)(A). In this case, if we assume that petitioner sustained a farm net loss and that petitioner disposed of farm recapture property and realized a gain in at least the amount of its farm net loss, none of this gain would be taxed at ordinary income rates because petitioner had a zero balance in its EDA since its farm net loss, if any, did not result in any benefit to it and must therefore reduce its EDA. Accordingly, the full amount of the gain realized upon the sale of property which petitioner asserts to be farm recapture property should be included in the amount of petitioner's net long-term capital gains with respect to which petitioner's alternative tax is calculated.

Petitioner argues that respondent's interpretation of section 1251 is incorrect because section 1251(a) clearly states that section 1251 applies if there is a farm net loss *or* if there is a balance in the EDA. Petitioner alleges that it had a farm net loss and therefore section 1251 should apply. In this argument petitioner ignores the provisions of section 1251(c)(2) limiting the amount of farm recapture income which is to be treated as ordinary income to the amount in the EDA. Because there was a zero balance in petitioner's EDA at the end of its fiscal year 1971, section 1251 does not cause any of its farm recapture income to be treated as ordinary income.

Petitioner argues that respondent's position deprives it of the "benefits" of section 1251 because of computation of its tax under section 1201. Section 1251 was enacted to prevent taxpayers from effectively converting ordinary income into capital gains. It was intended to increase the tax burden on a taxpayer with a farm net loss, not diminish it, as petitioner's

construction of the statute would do. *Gragg v. United States*, 213 Ct. Cl. 226, 551 F.2d 827, 832 (1977).

Petitioner further contends that a subtraction from its EDA of the amount of the net farm loss which did not result in a tax benefit to it would frustrate the purpose of section 1251 because it could result in avoidance of ordinary income treatment in subsequent years to the extent of the subtraction from the EDA. Apparently the provisions of section 1.1251–2(c)(3)(i), Income Tax Regs., that the amount subtracted from the EDA to reflect any farm net loss not reducing taxable income is a *temporary* subtraction, which is made for the purpose of determining what amount in the EDA will be treated as ordinary income during the taxable year, was intended to provide for the situation which petitioner suggests might result if respondent's position is sustained.

Because we have held that any farm net loss which petitioner incurred in its fiscal year 1971 would not result in a decrease in its capital gains and an increase in its ordinary income under the provisions of section 1251, it is unnecessary for us to decide whether petitioner was in fact engaged in the trade or business of farming with respect to all its rural property and, if so, whether it in fact incurred a farm net loss in its fiscal year 1971.

Petitioner contends in the alternative that if we hold for respondent with respect to the section 1251 issue, then the gain from the sale of cattle in its breeding herd which it acquired in the section 351 transfer should be treated as ordinary gain from the sale of property held by it primarily for sale to customers in the ordinary course of its trade or business within the meaning of section 1231(b).

Section 1231(a) provides that when gains from the sales of property used in a taxpayer's trade or business exceed losses from the disposition of such assets, the gains and losses shall be treated as gains and losses from sales or exchanges of capital assets. Under section 1231(b)(1)(B), property held primarily for sale in the ordinary course of a taxpayer's trade or business is specifically excluded from the definition of "property used in the trade or business."

Under section 1231(b)(3)(A), the term "property used in a trade or business" is defined so as to include cattle held by a taxpayer for breeding if held for 12 months when acquired prior

to December 31, 1969, or held for 24 months or more from the date of acquisition if acquired thereafter.

Petitioner's primary position in this case is that the $322,987 gain it had in its fiscal year 1971 from the sale of breeding cattle is long-term capital gain which is farm recapture income treated as ordinary income under section 1251. In its alternative argument, petitioner takes a totally inconsistent position and contends that the $322,987 gain on the sale of breeding cattle in its fiscal year 1971 was ordinary income from the sale of breeding cattle held by it for sale in the ordinary course of its trade or business. While legally petitioner is entitled to take inconsistent positions, it is not for this reason relieved of proving the facts necessary to sustain its inconsistent position. Where, as here, the issue is solely one of fact, the taxpayer has a very difficult situation with respect to its burden of proof. In our view this record does not contain evidence to establish that petitioner was in the trade or business of selling breeding cattle in its fiscal year 1971. In fact, most of the evidence is understandably to the contrary in support of petitioner's primary position that its breeding cattle were a capital asset.

On its original return, as amended, petitioner reported under section 1231 a gain of $322,987 from the sale of breeding cattle. Petitioner's primary argument that the gains from the sale of its breeding cattle constituted farm recapture income under section 1251(c), necessarily would require a contention that the gains from the sale of the breeding cattle constitute farm recapture property under section 1251(e)(1)(A), which in turn refers to section 1231(b)(3) relating to livestock used in a taxpayer's trade or business. Livestock used in a taxpayer's trade or business by definition cannot be assets held primarily for sale to customers in the ordinary course of that taxpayer's business. However, petitioner makes the alternative argument that the breeding cattle it sold in its fiscal year 1971 were held primarily for sale to customers in the ordinary course of business and therefore the gain from the sale was ordinary income, since if this position were sustained the result would be a reduction in petitioner's long-term capital gains for its fiscal year 1971 and therefore a reduction in its income tax for this year, since its tax is the alternative tax computed under section 1201.

Petitioner does not deny that the cattle were breeding cattle and part of a breeding herd at the time they were acquired in

the section 351 transfer. Petitioner contends, however, that the status of the cattle in the hands of the transferor is not determinative of the status of the cattle in its hands. See *Acro Manufacturing Co. v. Commissioner*, 334 F.2d 40 (6th Cir. 1964), affg. 39 T.C. 377 (1962), cert. denied 379 U.S. 887 (1964). Petitioner argues that soon after it acquired the breeding herd it decided that corporate ownership of breeding cattle could not be justified and decided to sell the breeding cattle within a few years. Petitioner points out that its manner of disposition of cattle, the sale each year of the calf crop, was totally inconsistent with the idea of maintaining a breeding herd. Accordingly, petitioner asserts that the breeding cattle were held primarily for sale to customers in the ordinary course of business, notwithstanding the way in which the sales were reported on its income tax return.

Oppenheimer supervised the maintenance of petitioner's breeding cattle, locating contract ranchers who agreed to care for the cattle, to provide adequate land and water for grazing, to provide necessary veterinary care, and to supervise the breeding of the cattle. Oppenheimer advised its clients that clients like petitioner, who conducted breeding operations through agents, would generally be considered to be in the trade or business of farming. Accordingly, petitioner, during the period in which it owned the breeding cattle, deducted against ordinary income the expenses of operating and maintaining its breeding herd, including depreciation. Once the decision was made to liquidate the herd, petitioner did not intend to replace the breeding cattle or to acquire additional breeding cattle. It bred the cattle prior to sale primarily in order to obtain the highest profit possible on the sale of the breeding cattle.

In our view, the fact that petitioner decided early in its operations to liquidate its breeding herd does not establish that it entered into the trade or business of selling breeding cattle. A decision to liquidate a breeding herd does not put a taxpayer in the trade or business of selling breeding cattle. *Flato v. Commissioner*, 14 T.C. 1241, 1249–1250 (1950), affd. 195 F.2d 580 (5th Cir. 1952). Cf. *Moore v. Commissioner*, 30 T.C. 1306 (1958). Liquidation of the breeding herd was not petitioner's business. Compare *Estate of Kahn v. Commissioner*, 499 F.2d 1186, 1190 (2d Cir. 1974), affg. a Memorandum Opinion of this Court. Petitioner has made no showing of an intention to replace the

cattle disposed of in order to continue with sales of breeding cattle, nor has it shown that it advertised breeding cattle or held itself out as a seller of breeding cattle. These are all factors to be considered in determining whether a taxpayer is in the trade or business of selling breeding cattle. See *Gotfredson v. Commissioner*, 217 F.2d 673 (6th Cir. 1954), affg. a Memorandum Opinion of this Court, cert. denied 350 U.S. 846 (1955).

Section 1.1231–2(b)(1), Income Tax Regs., provides that the question of whether a taxpayer holds cattle for breeding purposes can usually be answered by looking at the taxpayer's actual use of the animal. The regulation further states that disposition of an animal within a reasonable time after its use for breeding purposes is made undesirable does not negate that the animal is held for breeding purposes. In this regard, example *(2)* in section 1.1231–2(b)(2), Income Tax Regs., provides:

> *Example (2).* The taxpayer retires from the breeding or dairy business and sells his entire herd, including young animals which would have been used by him for breeding or dairy purposes if he had remained in business. These young animals are considered as held for breeding or dairy purposes. The same would be true with respect to young animals which would have been used by the taxpayer for breeding or dairy purposes but which are sold by him in reduction of his breeding or dairy herd, because of, for example, drought.

This example outlines the precise situation present in this case. Because of a purported lack of tax advantages to corporate cattle breeders, petitioner decided to retire from cattle breeding and liquidate its breeding herd. It did so in a series of sales rather than a one-time liquidation sale so as to maximize its profits. Petitioner by its liquidation of its breeding herd did not enter the trade or business of selling breeding cattle.

*Decision will be entered under Rule 155.*